THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARK VEGA, Defendant-Appellant.

First District (6th Division)   No. 1—87—1970

Opinion filed September 7, 1990.

Mark W. Solock and Barry A. Spector, both of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Defendant, Mark Vega, was found guilty of murder and attempted murder and was sentenced to concurrent prison terms of 30 years and 5 years, respectively. On appeal, defendant contends the trial court erred in denying his first and second motions to quash arrest and suppress evidence because an illegal seizure occurred prior to a formal arrest, and because no probable cause existed for an arrest.

On March 13, 1986, 16-year-old Christine Special was shot in the head and killed while driving with Ida Caram at 21st Street near Washtenaw in Chicago. Caram told the police that she saw two young men standing near the car, making gang signals and shouting "Satan Disciples." The pair walked to the middle of the street, behind Special's car, and the shorter man pulled a gun and began shooting. Special was shot in the head. Caram ran from the car into a tavern, as the man continued shooting at her. Caram described the shooter as 18 years old, 5 feet 10 inches tall, thin build, and black hair. The man standing next to him was 19 years old, 6 feet tall, thin build, and black hair. She could not identify either man in lineups or photog :aph displays.

Robert Sanchez, the shooter, later pled guilty to the murder of Special and attempted murder of Caram, and was sentenced to a 35-year term. He is not involved in this appeal.

On October 1, 1986, a hearing was held on defendant's first motion to quash arrest and suppress evidence.

Maria Medina, defendant's mother, testified that officers spoke with defendant between March 13 and April 3. Medina telephoned the police and asked why they were looking for defendant. "[T]hey told me they just wanted to ask him some questions about the incident ***." An officer later telephoned and said defendant was at the station and being questioned. Her son was released. Also after March 13, 1986, Officers Thedford and Peterson came to Medina's home and asked for a photograph of defendant, which she gave them.

On April 3, 1986, at 12:40 p.m., Thedford telephoned and said they were coming over to ask defendant some questions about the incident. Medina told Thedford, "Fine." She knew her son had been mentioned in connection with the homicide. Medina wakened defendant. Twenty minutes later, Thedford and Peterson arrived. When defendant entered the room, Thedford "told him to get his jacket." Medina asked "why was he to go get his jacket if they were gonna ask him questions there." Thedford responded "that they could ask him questions better at the station." Medina reminded the officers that defendant had already been questioned and asked why he had to

go to the station again. "He told me that these tactical officers don't know how to ask questions; that they knew better how to ask him questions."

Medina testified that she told her son to go with the police because "[i]f I know that it's got something to do with the police, you just do what the police say." The officers promised that defendant would be home before Medina left for work at 3 p.m. Thedford gave Medina his business card with the telephone number for Area 4, in case she had questions. The officers did not ask if Medina wished to accompany them and did not indicate defendant could refuse to go. Medina did not tell the police she did not want her son to talk to them or that she wanted him to have a lawyer or ask what the questions concerned; and did not try to stop them or accompany them to the station.

Medina watched the officers take defendant to the car. "They had my son by his arm," and they opened the car door for him. After 3 p.m., Medina telephoned the police station every 20 to 30 minutes. She asked to speak with Thedford, but was told he was out on the street. After she tried at 4 p.m., Thedford returned the call. "He told me that my son wasn't cooperating [and asked] *** if I could talk him into taking a lie detector test." Thedford said defendant could then go home. Medina spoke with defendant and told him to cooperate so he could go home. She told him if he had no involvement with the homicide, he should take the test. Defendant did not tell Medina whether he was going to take the test. "He didn't know." Thedford then got back on the telephone and asked what defendant had said to Medina. Medina continued to telephone the station every half-hour after that. Early in the morning of the following day, Medina was told that defendant had made a statement concerning his involvement in the shooting.

Defendant, who was 16 years old at the time of the shooting, denied that on March 13, 1986, at 11:30 p.m., he was stopped by police in the vicinity of 21st and Washtenaw. About March 24, 1986, the police stopped him on the street and asked him about the shooting of a young girl.

On April 3, 1986, his mother woke him and said the police were coming to talk with him. He did not ask his mother why the police wanted to talk to him, and she did not offer any information. He did not know they wanted to talk about the shooting. He washed up before they arrived.

When the police arrived, they told defendant to put on his coat. Defendant did not refuse to accompany them. Defendant went with

the police because "I felt like I didn't have a choice." He felt compelled to go "[b]ecause the tone of voice was deep and they said, you know, get your coat. I obeyed them."

Thedford put his hand on defendant's arm, grasping it, before they walked out the door. Defendant was between the two officers. While walking down the stairs, defendant told the officers, "I don't want to go." He had not said that to his mother. The officers responded, "You're going."

Outside, at the unmarked car, the officers searched defendant after making him stand with his legs spread apart. They put him in the back seat of the car, where there were no handles inside the doors. During the 15-minute ride, the police never told him he was under arrest. Defendant testified that when they got in the car, he found out they wanted to question him about the shooting.

At the station, he was put in an interview room alone. The police said nothing to him. The door was closed and he heard a lock shut. The door had no handle.

Two hours after arriving at the station, defendant spoke with his mother on the telephone. He told her he did not want to stay at the station. "She told me to obey what they say and you'll come home." He repeated that he wanted to go home.

Officer Terrence Thedford testified for the State that Caram reported the circumstances of the shooting to him. On March 17 or 18, 1986, Thedford went to defendant's home. Thedford believed defendant might have information about the shooting. "I would say I didn't know if he had any more or less involvement than all the other names that came up in this investigation." Thedford had previously left word with defendant's mother and grandfather, and left business cards with a message that they wanted to talk to defendant, but defendant never contacted the police.

The preliminary police report stated that the offenders were affiliated with the Satan Disciples. Thedford did not believe defendant was in the Satan Disciples gang. He knew Caram had seen a photograph of defendant and had not identified it.

On April 3, 1986, at 1 p.m., Thedford telephoned Medina and said he would still like to talk with her son, and asked whether she knew where he was. She said her son had returned home after being gone for a few weeks. Thedford and his partner, Officer Steve Peterson, drove to Medina's home. They did not have an arrest warrant or search warrant.

At Medina's home, Thedford "just informed her that we were still working on the case and we would like to take her son and talk to

him at the police station." Thedford did not recall Medina asking why they could not question defendant at home, but it was possible that she did so. Defendant then entered the room. Thedford explained they were still investigating the shooting and, "I asked him if he would come down to the station and he said yes." They did not offer defendant the option of traveling to the station on his own. Leaving the apartment, defendant could have been walking between the two officers. Defendant did not say he did not want to accompany them. "He was totally cooperative."

At the police station, defendant was placed in an interview room. He was not handcuffed or advised of his rights. They did not lock the door, but Thedford could not remember if the door was closed. There were handles on the inside of the interview room doors. Defendant was free to leave. Thedford did not inform defendant of that fact.

During their conversation, the officers began to have doubts about defendant's statements. In regard to whether defendant was still free to leave at that point, Thedford testified: "It never came up." Thedford continued:

"THEDFORD: I am not sure what my decision would have been. I would say I probably would have tried to talk to him some more.

DEFENSE COUNSEL: And you would have tried to talk to him there, correct?

THEDFORD: Correct.

DEFENSE COUNSEL: And you would have tried to discourage him from leaving?

THEDFORD: Yes, if he wanted to leave. I don't think at that point I could have physically restrained him; had the right to restrain him. I am not sure."

After their initial conversation with defendant, the officers were "finished talking to him." When Thedford left the interview room, he did not "know if I closed the door. It may have been open. He was cooperating completely at this point." The police then tried, unsuccessfully, to contact defendant's girlfriend to confirm his alibi.

The officers wanted defendant to take a lie detector test because they had doubts about his statements concerning the night of the shooting. Defendant refused to take the test and insisted that he was not required to take it. Later, however, defendant said he might take the test. Thedford's report stated that defendant adamantly refused to take the test. It did not say defendant "might" take it. At this point, Thedford still did not inform defendant that he could leave. He again left defendant alone in the interview room.

In regard to a lineup, Thedford testified that the decision of whether to hold a lineup including defendant had not yet been made. "[W]e were thinking in that direction." Nevertheless, if defendant had tried to leave then, Thedford did not "think I would have physically restrained him." He would have "gone over and talked to him." Thedford continued:

"If stopping him is a matter of physically tackling him or—I don't know if I would have physically tackled him.

＊ ＊ ＊

I wouldn't have gone and stopped him. I would have walked up to him and explained the circumstances and asked for a reason.

＊ ＊ ＊

He would not have to give me a reason, but being a reasonable man, I would have liked to have asked what was happening. I am trying to conduct an investigation."

Defense counsel also asked whether Thedford would have physically stopped him just to talk to him. Thedford responded, "It would have depended upon the amount he was deciding to leave with."

At about 4 p.m., Thedford telephoned Medina to inform her of the progress of the investigation. Thedford told Medina that defendant was not cooperating as far as taking a lie detector test. He told her defendant was "fully cooperative up to the point of the polygraph, which I felt was unusual." He testified further:

"Basically I told her just exactly what her son had said about his knowledge of the case and where his whereabouts were and of the fact that we had some doubts about everything he was telling us and that we had asked if he would be willing to take a lie detector test and he was adamant in his refusal to take a lie detector test.

I asked—I don't recall—I asked her or she asked to talk with her son, but at some time, Mark was permitted to talk with his mother."

They spoke for 5 to 10 minutes. Thedford spoke with Medina again, "[j]ust to explain to her that we were still talking with her son and that I would have to see what would be the decision made on the investigation with regards to the third watch and what would happen with her son." Thedford turned the case over to Officers Vucko and Summerville.

"I had to basically explain the entire investigation to them. The circumstances of how it happened to the information that had come into our office to the progress of the investigation to the

point where we had talked with [defendant] in the [A]rea; what he had told us.''

Thedford also told Summerville and Vucko that they were considering ''the avenue that we may have to have a line-up.'' Thedford told them defendant had said he would ''think about'' whether to take the lie detector test.

Officer John Summerville testified that on April 3, 1986, at about 4 p.m., he had his first contact with the Special case. He spoke with Thedford and Peterson, and with their supervisor. Summerville was told to ''continue the investigation.'' Thedford and Peterson told Summerville they wanted to run a lineup with defendant. They also told Summerville to see if defendant would take a lie detector test. He knew that earlier defendant had refused to take the test. ''They also told us what he said, as far as his activities on that night.'' Summerville had ''no suspicions one way or the other'' about whether defendant had been involved in a crime. In Summerville's mind, defendant was not a suspect.

Summerville testified that he went into the interview room in which defendant sat and that the room was unlocked. He did not plan on ''questioning'' defendant. He simply repeated defendant's earlier statements and asked if that was what defendant had told the other officers. He then asked whether defendant would take the lie detector test. At that point, defendant ''said he would take the polygraph test.'' Vucko then went to make a 5 p.m. appointment with the polygraph unit. On cross-examination, however, Summerville testified that his police report said defendant replied ''that he might take the test.'' Summerville explained: ''It was like he would make his mind up when he got to the polygraph. That's how he explained it to me.''

Summerville testified that if defendant had ''tried to leave, I don't know what I would have done. I would have had to ask the supervisor who had more knowledge of the case, because at that point, he was a witness as far as I knew, and we were just taking him for a polygraph.'' And: ''I would have gone to my supervisor, maybe ended up going to Felony Review. I didn't know what his status was.'' He wouldn't have let defendant leave until he found ''out what was going on.''

At 5 p.m., Summerville and Vucko drove defendant to 11th and State Street, where the polygraph section was located. They took the file with them, including all the reports and photographs. Summerville did not recall conversing with defendant in the car. Within a few minutes after entering the polygraph room, defendant refused to take the test. ''He said he didn't want to be a stool pigeon. [He said,] I can't

tell you who the shooter was, but I will point out the name because I saw it in your report." At that point, Summerville did not give defendant his rights because he still did not think defendant was a suspect.

Summerville showed defendant the reports, which defendant flipped through, until he came to a certain page. Defendant pointed out the name of Robert Sanchez. "I asked how he knew Mr. Sanchez did the shooting, and he said I know because I was with him before, during and after the incident." Summerville then placed defendant under arrest and advised him of his rights. Summerville agreed that his police report listed Thedford and Peterson as also being arresting officers, even though they were not present at 5 p.m.

The officers drove defendant back to Area 4. Defendant was still not handcuffed. At Area 4, defendant was put in an interview room, and the door was locked. At no time did defendant indicate that he did not want to speak with the officers or that he wished to leave the station. Summerville spoke with defendant from 5:30 p.m. until 5:45 p.m. He was again given his rights. At 10:30 p.m., defendant was given dinner and was told that the police had not yet found Sanchez. At 1 a.m., the officers telephoned felony review, and an assistant State's Attorney arrived at 2 a.m. At 4:40 a.m., defendant gave a court-reported statement, after again being advised of his rights. A youth officer was present at that time. Defendant later read the statement, made corrections, and signed it.

The trial court found that no seizure was made before 5 p.m. Until that time, the police treated defendant as a witness. Defendant and his mother "consistently cooperated with the police to the point the mother even urged the defendant to take a lie detector test." Neither defendant nor his mother made a "fuss about his leaving" the home with the police. The court stated, "There is absolutely no evidence to suggest anything but a very cordial relationship existed between *** the mother and the defendant and the police officers." Where the officers' stories differed from defendant's, the court found it did not believe defendant.

The court emphasized that the police did not tell defendant he was under arrest; did not handcuff him; did not lock the interview room door; did not give him his rights; and did not call a juvenile officer. The court believed the officers' testimony that defendant was free to leave. It was not unusual to check with a supervisor before permitting defendant to leave, because defendant might be a "minor in need of supervision" or a material witness.

The court refused to consider whether or not there was probable

cause to arrest at 5 p.m. Thus, defendant filed a second motion to quash and suppress, raising the probable cause question. The court ruled that probable cause did not exist at the point that the police knew defendant fit the description of the second person; that defendant's name came up as being in the area; that defendant refused to take a lie detector test; or that defendant pointed out the shooter's name. However, probable cause to arrest existed at the point when defendant stated that he knew the shooter because he was with him before, during and after the murder. The police had probable cause to arrest defendant.

Defendant contends that the trial court erred in denying the motion to quash arrest and suppress evidence. Defendant maintains that he was taken into custody prior to 5 p.m. on April 3, 1986. We agree.

■■■ A reviewing court will not disturb a ruling on a motion to suppress unless the decision was manifestly erroneous. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766.) An individual's fourth amendment rights are violated where he is seized and questioned while in custody on less than probable cause. (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) The test is whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Michigan v. Chesternut* (1988), 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975; *People v. Reynolds*, 94 Ill. 2d 160, 445 N.E.2d 766.

There are many factors which can be examined in determining whether a seizure has been made for fourth amendment purposes. An analysis of the relevant factors here indicates defendant was in fact seized prior to 5 p.m. when he was formally placed under arrest.

Defendant was not questioned briefly where he was found, in his home. (See *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (defendant taken from a neighbor's home).) This is true despite his mother's inquiry as to why defendant could not be questioned at home. (See *People v. Stofer* (1989), 180 Ill. App. 3d 158, 167, 534 N.E.2d 1287.) Defendant was not told, at this point, that he could refuse to accompany the police. See *People v. Stofer*, 180 Ill. App. 3d 158, 534 N.E.2d 1287.

Interestingly, defendant had refused to comply with the police officers' earlier and repeated attempts to contact him. Thedford left his card and messages with several people, but defendant never responded voluntarily.

Defendant was then transported to the police station in a squad car, locked in the back of the car. (See *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (defendant transported to

police station in police car); *People v. Stofer*, 180 Ill. App. 3d 158, 534 N.E.2d 1287; *People v. Avery* (1989), 180 Ill. App. 3d 146, 534 N.E.2d 1296.) He was not given the choice of arranging his own transportation to the station. *Cf. People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103 (police gave defendant choice of driving down in his own car and defendant chose to ride with officers); *People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635; *People v. Ealy* (1986), 146 Ill. App. 3d 557, 497 N.E.2d 101.

Defendant was placed in an interrogation room at the police station. (See *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *People v. Savory* (1982), 105 Ill. App. 3d 1023, 435 N.E.2d 226.) The only time defendant was let out of the interview room was when the police permitted him to talk to his mother on the telephone, in the hope she could convince him to take a polygraph, and when the police accompanied him to the polygraph location. This permitted a reasonable belief that defendant was to remain in the room while the police continued their investigation.

Defendant was never informed that he was free to leave. (See *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *People v. Fitzpatrick* (1982), 107 Ill. App. 3d 876, 438 N.E.2d 222.) Summerville testified he would have physically restrained defendant if he tried to leave, and Thedford testified he was not sure whether or not he would have restrained defendant. The State argues that Summerville was merely using prudence because he "had little knowledge of the case." Summerville testified, however, that Thedford and Peterson told him everything defendant had said and told him to run a lineup and try for a lie detector test. Thedford testified he told Summerville about the "entire investigation."

Summerville testified that Thedford told him they wanted to run a lineup with defendant, notwithstanding the fact the Caram had not been able to identify him from a photograph. *Cf. People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103 (police placed defendant in a lineup, and kept him for an additional four hours, despite witness' failure to identify him).

The officers testified that they did not believe the answers defendant gave to their questions. They left defendant alone in the interrogation room while they attempted to verify his alibi with his girlfriend. They repeatedly challenged defendant to take a lie detector test, even after he had refused and declared that he knew he did not have to take the test. (*Cf. People v. Townes*, 91 Ill. 2d 32, 435 N.E.2d 103 (unlawful arrest partially evidenced by fact that police asked defendant to take medical examination).) Thedford testified that he

told Medina "we were still talking with her son and that I would have to see what would be the decision made on the investigation with regards to the third watch and what would happen with her son." This does not sound like the description of a youth voluntarily present at the police station over an extended period of time. Next, still without defendant's consent, the police transported him in a police car to a crime laboratory for a polygraph test.

In addition, Summerville listed Thedford and Peterson as arresting officers, although they were no longer working or present at 5 p.m., when defendant was formally arrested. See *People v. Stofer*, 180 Ill. App. 3d at 168.

We also consider defendant's age, 16 years old, and his absence of extensive experience with the criminal system. See *People v. Stofer*, 180 Ill. App. 3d 158, 534 N.E.2d 1287; *People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635.

Moreover, no probable cause existed to justify defendant's arrest at 1 p.m., at his home. (See *People v. Stofer*, 180 Ill. App. 3d 158, 534 N.E.2d 1287.) The police knew only that defendant, among at least six other young men, might have been in the area at the time of the shooting. They knew defendant fell into the broad description of one of the assailants. They knew gang signs were used, but also knew defendant was not a member of the gang. They knew defendant had not been identified by Caram. There was no probable cause for defendant's arrest at that time.

The State also points out that defendant was not given his *Miranda* rights. The mere fact that the police did not term their actions a formal "arrest," book defendant, and give him his rights, while relevant, does not determine whether or not a seizure was made. See *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. *Cf. People v. Townes*, 91 Ill. 2d 32, 435 N.E.2d 103 (unlawful seizure partially indicated by fact that defendant was given *Miranda* warnings before each interview).

The trial court's determination that a reasonable person in defendant's situation would have considered himself free to go was manifestly erroneous. We hold that the court erred in finding no arrest was made at 1 p.m. when defendant was taken from his home.

■ The State asserts, however, that even if defendant was arrested or seized at 1 p.m., his subsequent confession was an act of free will unaffected by the initial illegality of his detention. The State maintains that sufficient attenuation exists to purge the statements made by defendant at 5 p.m., from the taint of his illegal seizure at 1 p.m. The determination that an illegal seizure occurred does not auto-

matically require the exclusion of the subsequent confession. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) The relevant question is whether the confession was obtained by exploitation of the illegality of the arrest. (*Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) The statement may be admitted only if it was not obtained by means sufficiently distinguishable to be purged of the primary taint. (*Wong Sun v. United States* (1963), 371 U.S. 471, 487-89, 9 L. Ed. 2d 441, 455-56, 83 S. Ct. 407, 417-18, quoted in *People v. White* (1987), 117 Ill. 2d 194, 222, 512 N.E.2d 677.) The key question is whether a causal connection exists between the illegal seizure at 1 p.m. and the statements made at 5 p.m. *Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

The trial court, however, was not presented with this issue. Thus, we remand for the trial court's determination of whether sufficient attenuation exists to purge the statements made by defendant from the taint of his earlier seizure.

■ We find no merit in defendant's contention that the trial court erred in denying his second motion to quash arrest and suppress evidence, which was based on the trial court's finding that the police had probable cause to arrest defendant after his statements were made.

Probable cause for defendant's arrest existed once defendant stated that Sanchez was the shooter and that defendant had been with Sanchez before, during and after the shooting. This information, in combination with other information the police had, was sufficient to give the officers probable cause to arrest defendant after his statements were made.

In summary, the finding of the circuit court of Cook County that defendant was not arrested before 5 p.m. is reversed, and the cause is remanded for a hearing as to whether there was sufficient attenuation to purge the statements from the taint of the earlier arrest. If the court finds such attenuation, it is directed to reinstate the judgment of conviction. If the court finds no such attenuation, it is directed to suppress the confession and to conduct further proceedings consistent with the views expressed herein.

Reversed and remanded with directions.

EGAN and RAKOWSKI, JJ., concur.