THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY WILLIAMS, Defendant-Appellant.

First District (2nd Division)    No. 1—97—1180

Opinion filed February 16, 1999.

34

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Sari L. London, and Mary Morris, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

Following a bench trial, defendant Anthony Williams was convicted of first degree murder and armed robbery and sentenced to 38 years' imprisonment for first degree murder and a concurrent sentence of 30 years' imprisonment for armed robbery. Defendant appeals, claiming that his statements should have been suppressed because he was arrested without probable cause and because his statements were the product of coercion. We affirm.

Prior to defendant's trial, a hearing was held on defendant's motions to suppress his statements. Detective John Halloran testified that, after the body of Louis Jackson, the victim, was found on October 10, 1994, he learned that defendant was the victim's friend and had been arrested with him in the past. On the evening of October 11, 1994, Detective Halloran and his partner, Detective Budroe, interviewed defendant in a police car outside defendant's home at 6434 South Hoyne in Chicago and asked him if he had any information about the victim's murder.

The 17-year-old defendant told the detectives that he had been with the victim at 63rd and Hamilton playing dice until about 3 a.m. on the morning of October 10, 1994. Defendant stated that the victim had between $100 and $150 and seven bags of marijuana on him when they left the game and returned to defendant's home to get something to eat. Defendant told the detectives that at about 4 a.m., while defendant was cooking in the kitchen, someone knocked at the front window and called the victim outside in order to purchase some marijuana from the victim. The victim left, leaving his leather jacket, and never returned. Defendant told police that he still had the victim's jacket at his home.

Following their conversation with defendant, Detectives Halloran and Budroe spoke with the victim's mother, Marie Moore, at 6439 South Winchester. Moore told the detectives that defendant had come to see her on October 10, 1994, claiming to be her son's best friend. Defendant told her he was leaving town right away and offered to give her money. Moore did not believe defendant because he looked down and did not look her in the face. Moore told the detectives that she had never met defendant before. Defendant did not tell Moore about the dice game or the leather jacket.

Detective Edward Schmidt testified that he was assigned to the case on October 10, 1994, and went to the scene and to the victim's home. He was approached by a black man who would not give his name and said he did not want to get involved, but told the detective that he arrived at defendant's home at 2:30 a.m. and was let in by a boy named Rico. The victim, defendant, Rico's mother and someone named Gina were there. The victim left after an hour. Defendant left to find the victim but was unsuccessful. The man reported that defendant said he went to visit the victim's mother because he felt so bad about the victim.

Detectives William Moser and Albert Graf took over the murder investigation late on the evening of October 13, 1994, and went to defendant's home shortly after midnight on October 14. Detective Moser testified that a woman let them into the home, after they explained that they wished to speak with defendant since he was the victim's best friend. The woman directed them to a basement sleeping area where, according to Detective Moser, they found defendant sitting on a couch. Detective Moser asked defendant if he would come to Area One to talk about the victim, and defendant agreed. The detectives did not have their guns drawn, and defendant was not handcuffed or restrained. Defendant rode in the back of the police car. Detective Moser testified that, when officers go to a home to make an arrest, six officers are usually present. Here, only two officers went to defendant's home.

Detective Moser testified that they arrived at Area One at about 1 a.m. on October 14, 1994. Defendant was seated unrestrained in the large roll call room and was given some coffee. The detectives asked defendant about the last time that he had seen the victim. Defendant gave the detectives the same information he had given to Detective Halloran but stated that he no longer had the victim's jacket. Defendant said that he told his brother Theodore to get rid of it. Defendant also said that Theodore let him in when he returned home with the victim after the dice game.

The detectives left defendant in the roll call room, not handcuffed, with the door open and with people going in and out, and went to speak with defendant's brother, Theodore Williams. Defendant was told neither that he was free to leave nor that he was not free to leave. Theodore told the detectives that on the night of the murder he was sleeping in the basement and did not hear his brother come in. He also did not hear any pounding at the front door, although he said if someone had been pounding, he would have awakened and investigated. Theodore said that his brother told him to get rid of the leather jacket. Because the jacket was dirty, Theodore put it in the garbage behind the house.

After searching unsuccessfully for the victim's leather jacket in the garbage, Detectives Moser and Graf returned to Area One and spoke to defendant again. Defendant was asked to take them to the site of the game. Defendant sat in the backseat of the car and directed Detective Moser to a home at 64th and Hamilton, a quarter to a third of a block from where the victim's body was found and very close to defendant's home at 64th and Hoyne. Upon returning to Area One, the detectives told defendant what his brother Theodore had said regarding his disposal of the victim's jacket and about not hearing or seeing the victim at his home the night of the murder. Defendant claimed that his brother must have been mistaken because defendant had told his brother to take the jacket to work and sell it. Detective Moser testified that the victim had seven bags of marijuana in his hand when the body was discovered, and defendant had told Detective Halloran that the victim had seven bags of marijuana on him the night of the murder. At 6 a.m., on October 14, 1994, Detective Moser placed defendant under arrest and advised him of his constitutional rights.

Detective Moser testified that he then asked defendant to take a polygraph exam. Defendant agreed to take the test and arrangements were made for defendant to take it on October 14, 1994, during the day shift. Defendant failed the polygraph test.

Detective Graf testified that at 3:30 p.m., on October 14, after he learned the results of the polygraph test, he located people defendant had said were present at the dice game. Detective Graf interviewed these people at the police station. At some point on the 14th, defendant was placed in a locked detention room. After each interview with the seven participants of the dice game, Detective Graf checked with defendant. Detective Graf testified that during this time defendant was given sandwiches, coffee, and cigarettes.

Detectives Moser and Graf went off duty earlier in the morning of October 15, and returned in the afternoon of the 16th. At 10 p.m. on the 16th, Detectives Graf and Moser again interviewed defendant after giving him his constitutional rights. Defendant, after being confronted with inconsistencies between what he had previously told police and what they had learned from others, told the detectives that he now wished to tell the truth and told the detectives about his involvement in the murder. Following a 30-minute conversation with the detectives, an assistant State's Attorney from the felony review unit was called.

At 1 a.m., on October 17, 1994, Assistant State's Attorney (ASA) Maria Kuriakos met with defendant. Kuriakos testified that defendant was not handcuffed and seemed fine. Kuriakos spoke privately with

defendant and asked him whether he had been threatened or abused. Defendant told her that he had been treated very well. Defendant made no complaints about physical abuse, and he appeared to have no injuries. Defendant said that he had been given two sandwiches to eat and given cigarettes, and that no threats or promises had been made to him. At 4:35 a.m. on the 17th, ASA Kuriakos took a court-reported statement from defendant.

Patricia Ann Hayes, a medical technician at Cermak Hospital, testified that she filled out a bruise sheet when defendant was admitted to Cook County jail on October 18, 1994. She stated that the intake records showed no complaints of abuse by police or documentation of bruising or other injury.

Roosevelt Williams, defendant's father, testified he went to the police station at Area One after hearing that his son had been arrested. He went to the second floor and asked to see defendant, but police would not allow a visit. While Roosevelt was waiting to see defendant, police escorted defendant to the washroom. Roosevelt testified that defendant was handcuffed behind his back, and his face was swollen. Roosevelt never notified anyone of defendant's condition or made any complaints.

The parties stipulated that Mrs. Cooper, a civilian detention aide at the Area One lockup, would testify that she visually checked defendant and filled out a questionnaire on October 17 at 7:30 a.m. She checked "no" to questions asking whether defendant had any obvious injury or pain.

The trial court denied defendant's motion to quash his arrest and suppress evidence. The court found that the police had probable cause to arrest defendant at his home on October 14, 1994, after learning that he had the victim's property, that defendant voluntarily accompanied police to the station, and that police had probable cause to arrest defendant at 6 a.m., on October 14, because they had probable cause earlier and because defendant made contradictory statements about the victim's jacket. Moreover, the trial court determined that the totality of the circumstances demonstrated that defendant's statement was voluntary, and the court specifically found that defendant had not been beaten.

During defendant's bench trial, Officer Daniel Rosas testified that when he saw the victim lying faceup with a head wound at 6419 South Hamilton, there were seven small plastic bags of what appeared to be marijuana lying near his hand.

ASA Kuriakos read defendant's court-reported statement. After waiving his *Miranda* rights, defendant said in his statement that he was 17 years old and a tenth-grade student at Healy School. On

October 9, 1994, he went to a dice game at Shariff Saheed's house. The victim and other people were there. They shot dice for money until 3 a.m. and defendant lost $35 of the $50 he had with him. The victim won $250. After the game, defendant asked Shariff for a pistol for protection. Defendant and the victim went to defendant's house and looked at the gun, which was loaded with five bullets.

Defendant and the victim left to return to Shariff's house, and while they were going through a vacant lot, the victim began bragging how he won the dice game. Defendant said that this made him feel like a loser. Defendant stated that he was mad and wanted to hurt the victim, so he took out the gun and pulled the trigger while the gun was pointed at the back of the victim's head. The victim fell down on his face. Defendant turned the victim over and smacked him to see if he was still alive, but he did not move. Defendant reached into the victim's pants pocket to retrieve the money he had lost in the dice game. He took $90 and the victim's leather jacket.

Defendant said the jacket had dirty blood on it, and he wanted to get rid of evidence. He returned home, put the pistol in his mattress, ate some rice and went to sleep. The next morning, he learned that the victim was dead. That evening, he threw the gun in the Washington Park lagoon.

Defendant said in his statement that he had been treated "good" and that no promises had been made to him. He had been fed two sandwiches, water, and soda pop and had been given cigarettes. He said that he could write a little English but could not read "that good."

The parties stipulated that: (1) Dr. Kirschner, the medical examiner, would testify that the victim died from a gunshot wound to the back of the head; (2) Officers Mazzola and Utterback would testify that they searched the Washington Park lagoon for the gun but could not find it; and (3) the parties would adopt the prior testimony of police officers from pretrial motions.

Defendant presented the testimony of his sister, Kiya Williams, who testified that, in October 1994, she lived with defendant and other family members at 6434 South Hoyne. At 2:30 or 3 a.m., on October 10, 1994, she was in her room watching TV. Defendant and the victim came in a little later. Kiya testified that she knew the victim and knew his voice because he had previously lived with them.

Kiya testified that defendant and the victim were loud that night and sounded drunk. She did not see them, but she heard them. She heard the victim tell the defendant, "Get Kiya to cook us something. Tell her I'll pay her." Kiya testified that the victim had on other occasions offered to pay her to cook for him. Defendant said that he was not going to wake up his sister.

Kiya testified that she heard a knock at the door and an argument about who was going to answer the door. She heard the victim go to the door and tell defendant that he would be back. After the victim left, Kiya heard defendant in the kitchen. She did not hear the victim return.

The trial court found defendant guilty of first degree murder and armed robbery and sentenced defendant to 38 years' imprisonment. Defendant first claims on appeal that his statement should have been suppressed since he was arrested without probable cause.

■ A trial court's ultimate determination on whether probable cause to arrest existed is reviewed *de novo*. *Ornelas v. United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996). However, the court's resolution of factual issues is entitled to deference on review and will not be disturbed unless manifestly erroneous. *People v. Perez*, 288 Ill. App. 3d 1037, 681 N.E.2d 173 (1997).

Defendant claims that he was arrested without probable cause at his home at 12:30 a.m. on October 14. The trial court determined that defendant voluntarily accompanied the officers to the police station shortly after midnight on October 14 in order to help them with their investigation and that, even if defendant was arrested at his home, probable cause to arrest existed at that time.

■ In determining whether an arrest has occurred, the court must consider whether a reasonable person, innocent of any crime, would have believed that he was not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975 (1988). *People v. Vega*, 203 Ill. App. 3d 33, 560 N.E.2d 983 (1990). The factors to be considered in making this determination include: (1) the time, place, length, mood and mode of the interrogation; (2) the number of police officers present; (3) any indicia of formal arrest or restraint; (4) the intention of the officers; (5) the subjective belief of the defendant; (6) whether defendant was told he could refuse to accompany police; (7) whether he was transported to the station in a police car rather than arranging his own transportation; (8) whether he was placed in an interview room, as opposed to a common area; and (9) whether he was told he was free to leave. *People v. Reynolds*, 257 Ill. App. 3d 792, 629 N.E.2d (1994); *Vega*, 203 Ill. App. 3d at 41-42. Courts must consider the totality of the circumstances to determine whether an arrest has been made. *People v. McClellan*, 232 Ill. App. 3d 990, 600 N.E.2d 407 (1992).

In support of his claim he was arrested at his home, defendant relies on the following cases, none of which we find persuasive. In *People v. Vega*, 203 Ill. App. 3d 33, 560 N.E.2d 983 (1990), for example, the police required the defendant to stand with his legs spread apart and searched him as they left his home, defendant was forced to take

a lie detector test after he refused to take one, and the police officers testified that, if defendant had attempted to leave, they might have physically restrained him. In *People v. Avery*, 180 Ill. App. 3d 146, 534 N.E.2d 1296 (1989), the police report said that defendant was arrested at his home, and at the station defendant was told that he could not leave. Defendant also relies on *People v. Beamon*, 213 Ill. App. 3d 410, 572 N.E.2d 1011 (1991), wherein five police officers went to the defendant's home and intended to arrest anyone who tried to leave the home, the officers argued with defendant's mother when they entered the home, and roused defendant from his bed. At the station, the defendant was handcuffed and given his constitutional rights.

■ In the instant case, however, the police did not make a show of force when they entered defendant's house, defendant was not handcuffed or restrained in any way, there were no indicia of arrest, and, at the station, defendant was not isolated in a locked interview room. Rather, the facts indicate that defendant voluntarily accompanied the police to the station and that his freedom of movement was not restrained until his arrest at 6 a.m. on the 14th. A detective testified that a typical arrest situation would have involved six police officers. Here, only two officers went to defendant's home. The officers did not surround the house or draw their guns. Defendant's sister let them into the house and directed them to the basement, where they found defendant sitting on a couch. The detectives asked defendant if he would accompany them to the police station to help with their investigation of the victim's murder, and defendant agreed. Defendant was not handcuffed or restrained when he accompanied the detectives to the station. When they arrived at Area One, defendant was seated in a large roll call room, with people going in and out, and was given coffee. He was not restrained and the room was open. Defendant was not given his constitutional rights, fingerprinted, or photographed until after he was formally arrested at 6 a.m. Based on these circumstances, we find that defendant was not under arrest prior to 6 a.m. on October 14.

■ We, therefore, need not determine whether the police had probable cause to arrest defendant at 12:30 a.m. on the 14th, but rather, we must determine whether they had probable cause to arrest defendant at 6 a.m. on that date. Probable cause to arrest exits when facts and circumstances within the arresting officer's knowledge are sufficient to warrant a person of reasonable caution to believe that an offense has been committed and that defendant committed the offense. *People v. Neal*, 111 Ill. 2d 180, 489 N.E.2d 845 (1985).

■ When defendant was arrested at 6 a.m. on the 14th, the police knew that defendant had been with the victim at 4 a.m. on October 10

and that the victim's body was discovered about four hours later. They also knew that defendant possessed the victim's leather jacket and had told his brother to get rid of or sell the jacket. The detectives were aware that defendant went to the victim's mother's home shortly after the victim's body was discovered, offered her money, told her he was her son's best friend, and told her he was leaving town. The victim's mother also told the officers that she had never met defendant before. The detectives were also aware that defendant's version of events was inconsistent with information they had been given by others. Defendant had informed the detectives that, after the dice game, the victim and defendant went to defendant's house and made something to eat. Defendant told the detectives that his brother Theodore let them into the house. Defendant then said that at 4 a.m. somebody knocked at defendant's door and the victim left to sell that man some marijuana. However, shortly after the victim's body had been discovered, an unidentified man told a detective that several other people were at defendant's house at 2:30 a.m. on October 10, they were let into defendant's house by someone named Rico, and the victim left after an hour and defendant went to look for the victim. Furthermore, defendant's brother Theodore testified that he was asleep in the basement and did not hear his brother come into the house in the early morning of the 10th. Theodore also told the detectives that he did not hear any pounding on the front door and that, if he had heard any, he would have woken up and investigated.

In finding that these factors were sufficient to establish probable cause, the trial court relied on *People v. Creach*, 79 Ill. 2d 96, 402 N.E.2d 228 (1980). In that case, the police knew that defendant had been living with the deceased, who had been killed sometime after midnight. The defendant had been with the deceased at 1:30 a.m. and, without explanation, had left the state and driven the victim's car to Ohio.

While the defendant's possession of the victim's jacket in the instant case and his plans to leave town are not as suspect as actually leaving town in the victim's car, we nonetheless find the existence of probable cause to arrest defendant. The possession of the victim's jacket, coupled with the instruction to get rid of it, the plan to leave town, the fact that defendant was with the victim at 4 a.m. only a few hours before the murder occurred, the conflicting versions of events, and the unusual conversation defendant had with the victim's mother, was, in our view, sufficient to establish probable cause to arrest defendant.

■ Defendant next claims that his statement should have been suppressed since it was not given voluntarily. A statement is made vol-

untarily where, under the totality of the circumstances, it is given freely and without compulsion or inducement. *People v. House*, 141 Ill. 2d 323, 566 N.E.2d 259 (1990). Voluntariness turns on factors including the age, education and intelligence of the accused, the length of the detention, the duration of questioning, whether the accused was advised of his constitutional rights and whether the accused was subject to any physical mistreatment. *House*, 141 Ill. 2d at 376.

At the suppression hearing, defendant claimed that his confession was not voluntary because detectives beat him and because of the length of time between his arrest and the time he was taken before a judge. Conflicting evidence was introduced at the hearing as to whether defendant had been beaten while at the police station. The trial court found that defendant had not been beaten. On appeal, defendant does not challenge the trial court's credibility finding on this issue. Defendant, however, claims that even disregarding the testimony about physical abuse, defendant's statement was not voluntary since he was not timely taken before a judge, he is a slow learner, is addicted to marijuana, and has a seizure disorder.

■ At no time during the hearing on defendant's motion to suppress his statement did defendant claim that his statement was involuntary due to his being a slow learner, having a seizure disorder or being addicted to marijuana. Issues on the voluntariness of a confession not raised for the trial court's consideration are waived for the purposes of appeal. *People v. McClellan,* 232 Ill. App. 3d 990, 600 N.E.2d 407 (1992). We therefore only consider whether defendant's statements should be deemed involuntary based on the fact that he was not taken before a judge for a probable cause hearing until several days after his arrest.

■ After a warrantless arrest, the State must provide defendant with a prompt determination of probable cause by a neutral, detached magistrate. *Gerstein v. Pugh*, 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975). Failure to promptly present defendant before a magistrate does not invalidate a confession *per se*, but it is a factor to consider in determining the voluntariness of a statement. *House*, 141 Ill. 2d at 376.

In *People v. Dove*, 147 Ill. App. 3d 659, 498 N.E.2d 279 (1986), the defendant was arrested on a Wednesday, confessed the following Sunday and was taken before a judge the day after his confession. The defendant sought to suppress his confession based on the delay in taking him before a judge. In refusing to suppress defendant's confession, the *Dove* court stated:

> "Delay alone, however, is insufficient to penalize the State by excluding incriminating statements obtained during the period be-

tween the arrest and arraignment. The issue is whether the statements were made voluntarily. Only where the statements are involuntary must they be excluded. *** Unnecessary delay is only one factor to be considered in determining the voluntariness of an incriminating statement. Seventy-two hours, for example, between the arrest and arraignment does not *per se* render such a statement involuntary. The question of voluntariness is for the trial court to determine on the totality of the circumstances, and its decision will be reversed only if it is against the manifest weight of the evidence." *Dove*, 147 Ill. App. 3d at 667.

The *Dove* court also noted that two of the days defendant was held between his arrest and arraignment were Saturday and Sunday, court holidays. Thus, the court concluded that the delay was not unnecessarily long. See also *People v. Williams*, 230 Ill. App. 3d 761, 595 N.E.2d 1115 (1992) (defendant's statement was not involuntary although made 57 to 60 hours after arrest and he was not taken before a magistrate until 63 hours after his arrest); *People v. House*, 141 Ill. 2d at 379 (defendant's confession not suppressed where defendant was not taken before a magistrate until 64 hours after incarceration and 37 hours after he confessed); *People v. Travis*, 170 Ill. App. 3d 873, 525 N.E.2d 1137 (1988) (although defendant was not taken before a judge until four days after his arrest and was mildly retarded, the court found his confession voluntary, since *defendant* was repeatedly advised of his *Miranda* rights and waived them, he was not denied food or sleep, he began making incriminating statements the moment he entered the station, and he was not relentlessly interrogated). In each of these above-mentioned cases, the appellate court affirmed the trial court's decision on voluntariness as not being against the manifest weight of the evidence.

The case relied upon by defendant, *People v. Hadnot*, 163 Ill. App. 3d 215, 516 N.E.2d 582 (1987), likewise considered the totality of the circumstances in concluding that the trial court's decision that defendant's statements were not voluntary was not against the manifest weight of the evidence. The *Hadnot* court suppressed some of defendant's statements, not simply because of a four-day delay in giving defendant a probable cause hearing, but because the totality of the circumstances revealed these statements were not given voluntarily. The court found persuasive that defendant was not allowed to communicate with family members, he was not allowed to change clothes, shower or use the bathroom, and the police used a "Mutt and Jeff" routine to induce defendant to confess and did not keep their promise to release defendant if he took a polygraph test.

In the instant case, defendant was placed under arrest at 6 a.m.

on October 14, 1994. At some time after 3:30 p.m. on October 14, he was placed in a locked "detention room." He left only to accompany police, at their request, to another station for a polygraph examination. Defendant made his first inculpatory statement at about 11 p.m. on October 16, 65 hours after his formal arrest. He gave a court-reported statement sometime after 4 a.m. the following morning, 70 hours after his formal arrest. Defendant remained at Area One until the morning of October 17, when he was taken to the lockup. He was not taken to court for a probable cause hearing until October 18.

■ While we do not condone the lengthy delay between defendant's arrest and his probable cause hearing, we nonetheless cannot say that the trial court's decision that defendant's confession was voluntary under the totality of the circumstances was against the manifest weight of the evidence. The trial court found, and we agree, that other than the length of defendant's detention, there are no additional factors indicating that defendant's will was overborne. The length of time between defendant's arrest and confession is less than that in *Dove*. Moreover, although the defendant in the instant case was arrested on a Friday morning and was not taken before a judge until the following Tuesday, some of this delay can be explained by the fact that Saturday and Sunday are days when court is not regularly in session. Furthermore, while defendant was not taken before a judge until at least a day and a half after his confession, the damage already had been done at the time of the confession, and we do not see how that further delay prejudiced defendant. *House*, 141 Ill. 2d at 380. Under these circumstances, we, therefore, affirm the trial court's order denying defendant's motions to suppress his confession.

Affirmed.

GORDON, P.J., and RAKOWSKI, J., concur.