THIRD DIVISION
September 20, 2006

No. 1-04-2172

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| MARIANO LOPEZ, | ) | Honorable Michael B. Bolan |
| | ) | and Honorable Clayton J. Crane, |
| Defendant-Appellant. | ) | Judges Presiding. |

JUSTICE KARNEZIS delivered the opinion of the court:

Following a bench trial, defendant Mariano Lopez was found guilty of first degree murder, armed robbery, home invasion, attempted aggravated arson and aggravated unlawful restraint and was sentenced to concurrent prison terms of 23 years, 20 years, 20 years, 5 years and 3 years, respectively.[1] On appeal, defendant contends: (1) the trial court erred when it denied his motion to quash arrest and suppress evidence; and

---

[1] The Honorable Michael B. Bolan presided over defendant's pretrial motions before retiring. The Honorable Clayton J. Crane presided over defendant's trial.

1-04-2172

(2) defendant's written statement should have been suppressed pursuant to Missouri v. Seibert, 542 U.S. 600, 159 L. Ed. 2d 643, 124 S. Ct. 2601 (2004). We affirm.

Defendant was convicted of killing Hector Andrade. Andrade was discovered on the morning of July 14, 1998, in his apartment with his arms, legs and mouth bound with duct tape. He had been stabbed 12 times. Defendant, William Andrade[2] and Jose Leal[3] were arrested and charged with the murder. Defendant, who was 15 years old at the time of the murder, implicated himself in the murder during questioning by police officers. Defendant's first statement, given at approximately 6 p.m. on July 21, 1998, was suppressed by the trial court. Defendant's second statement, which was

---

[2] William Andrade and the victim are not related. William Andrade's conviction was affirmed in part and vacated in part on appeal. People v. Andrade, No. 1-01-1719 (2003)(unpublished order under Supreme Court Rule 23).

[3] Jose Leal's conviction was affirmed on appeal. People v. Leal, No. 1-03-2226 (2005)(unpublished order under Supreme Court Rule 23).

memorialized in writing at approximately 10 p.m. that evening, was not suppressed and is the subject of this appeal.

Initially, we note that defendant's contentions on appeal relate solely to the trial court's rulings on defendant's pretrial motions to quash arrest and suppress evidence. Yet, defendant failed to include the actual motions that were filed in the trial court in the record on appeal. Illinois Supreme Court Rule 321 (155 Ill. 2d R. 321) provides, in pertinent part:

"The record on appeal shall consist of the judgment appealed from, the notice of appeal, and the entire original common law record * * *. The common law record includes every document filed and judgment and order entered in the cause * * *." 155 Ill. 2d R. 321.

Nevertheless, we will review defendant's claims of error as supported by the transcripts from the hearing that defendant did include in the record on appeal. We note that it is appellant's burden to present a sufficiently complete record to support his claims of error. Foutch v. O'Bryant, 99 Ill. 2d 389, 391 (1984). Any doubts that may arise from the incompleteness of the record will be resolved against the appellant. Foutch, 99 Ill. 2d at 392.

Defendant first contends that the trial court erred in denying his motion to quash arrest and suppress evidence. Defendant maintains that he was under arrest when police officers took him from his home and, because the officers lacked probable cause to arrest him at that point in time, his arrest was illegal. Defendant therefore maintains

that because his arrest was illegal, his written statement should be suppressed "as the fruit of his illegal arrest."

At the hearing on defendant's motion to quash arrest, defendant testified that three police officers came to his home at about 1:15 p.m. on July 21, 1998. Two of the officers were inside and one was waiting in the hallway. The officers told defendant that he was going to go with them to the police station so they could ask him some questions. The officers told defendant to put his shoes on and one of the officers "pushed or grabbed" defendant and told defendant he was to go with them. The officers did not tell defendant's mother that she could accompany defendant. Defendant testified that he went with the officers because he thought he had no other choice. The two officers inside had guns but did not have them drawn. The third officer, in the hallway, had his gun out of its holster but then put it back. All of the officers were dressed in plain clothes. Defendant was placed in the backseat of the officers' police car and transported to the station. Upon arriving at the police station, defendant was brought into a room and questioned. He was in the room for about three to four hours. The officers would interrogate defendant and then leave the room for approximately two minutes and then return to question him again. The door to the room remained closed, and when officers left the room, they locked the door from the outside. None of the officers told defendant he could leave and he did not feel he was free to leave. Neither of defendant's parents was at the station nor was a youth officer present. Defendant

4

admitted that he never told the officers that he wanted to go home and that he never asked for his parents. The officers did not tell defendant that they wanted to talk to him about a homicide investigation; they told him they wanted to talk about gangs. Defendant stated that he was allowed to go to the bathroom whenever he needed to and he was offered food but was not hungry. Defendant was not handcuffed at any time and was fingerprinted only after his written statement was completed, at approximately 10 p.m. that night.

Defendant's mother, Maria Luisa Garcia, testified that when the officers came to her door, one of them asked for defendant and told her, "I'm going to take him." The officer later pushed defendant and told defendant, "let's go."

Lydia Villanueva, a friend of defendant's family, testified that she made several telephone calls to the police station to find out about defendant. She called the telephone number that was on the card that the officers had given to defendant's mother. She first spoke with Detective Bautista at about 3 p.m. that day. Detective Bautista told her that they were going to ask defendant some questions and then bring him home. She made several subsequent telephone calls, the last one at about 8 p.m.

Defendant's home phone records were introduced into evidence and showed that on July 21, 1998, between the hours of 2:30 p.m. and shortly after 7 p.m., there were five telephone calls placed from defendant's home to the number on the card that officers had given to defendant's mother.

Detective Alfonso Bautista testified that on July 21, 1998, he learned that

5

defendant was a possible witness in the murder investigation. He and his partner, Detective Dennis Keane, went to defendant's home at about 12 p.m. that day. He denied the presence of a third officer. Detective Bautista spoke to defendant's mother in Spanish and told her that they wanted to talk to defendant. He told her that they were conducting a homicide investigation and defendant's name had been mentioned by some people they had spoken with and they wanted to talk to defendant. Detective Bautista then introduced himself and his partner to defendant and told defendant that they were investigating a homicide. He told defendant that his name had been mentioned by some people they had spoken with and they wanted to ask defendant some questions. He further told defendant that he would prefer to ask defendant questions at the police station if defendant would agree. Defendant agreed to accompany them to the police station. Detective Bautista told defendant's mother where the police station was located, but she declined to go with them. Detective Bautista denied touching or pushing defendant as they left the apartment. They drove defendant to the police station in an unmarked car and defendant was not handcuffed.

Detective Bautista testified that, upon arriving at the police station, defendant was placed in an interview room. He stated that defendant was a possible witness, not a suspect at that time. He and Detective Keane had a conversation with defendant at about 1 p.m., but did not give defendant his Miranda rights. The conversation lasted about 15 to 20 minutes. The detectives informed defendant that they needed to verify the information he had provided and advised defendant that if he needed anything while

6

they were gone, he should knock on the door and another detective would come to the door. The detectives left the room and closed the door but did not lock it. They were gone for about 11/2 to 2 hours. When they returned, the door to the interview room was closed and unlocked. The detectives were also interviewing Jose Leal, who was at the station in a different interview room. At about 5:30 p.m., Leal implicated defendant in the murder. Shortly before 6 p.m., the detectives confronted defendant with Leal's statement and defendant made an inculpatory statement. Detective Bautista stated that they terminated the interview, gave defendant his Miranda rights and placed him under arrest. He stated that after Leal implicated defendant, defendant would not have been free to leave the police station.

Detective Bautista stated that they did not arrange for a youth officer when defendant arrived at the police station because he was a witness at that time and it was not common practice to have a youth officer present to interview a juvenile witness. He further stated that defendant never asked to leave the police station. Sergeant Dennis Keane[4] also testified at the hearing. His testimony was consistent with Detective Bautista's testimony.

---

[4] Sergeant Keane testified that, at the time of defendant's arrest, he had not yet been promoted to sergeant and was a detective.

The trial court denied defendant's motion to quash arrest finding that defendant voluntarily accompanied the detectives to the police station. The court noted that defendant was 15 years old at the time of his arrest and did not have any prior contacts with the police. The court also noted that defendant's mother was given a card with Detective Bautista's telephone number and was told where the police station was located. Defendant was not handcuffed at any time and defendant's mother was told she could accompany defendant to the police station. The court acknowledged the discrepancy in testimony regarding whether the detectives grabbed or pushed or touched defendant as they were leaving the apartment, but stated there was no way to substantiate that it occurred. The court concluded that considering all of the circumstances involved, defendant was not under arrest when he was brought to the police station.

On appeal, defendant contends that the trial court's finding that he was not under arrest until approximately 6 p.m. on July 21, 1998, was manifestly erroneous. He argues that he was under arrest when the officers took him from his home.

The standard of review applicable to a ruling on a motion to quash an arrest and suppress evidence is twofold. The trial court's factual findings and credibility determinations are upheld unless they are against the manifest weight of the evidence. People v. Jones, 215 Ill. 2d 261, 267-68 (2005). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. People v. Luedemann, 357 Ill. App. 3d 411, 417 (2005), *appeal allowed*, 216 Ill. 2d 713 (2005). After the trial

court's factual findings are reviewed, the court's ultimate legal rulings are reviewed *de novo*. Jones, 215 Ill. 2d at 268.

To quash an arrest as violative of the fourth amendment, the burden is on the defendant to show that an illegal seizure has occurred. People v. Graham, 214 Ill. App. 3d 798, 806 (1991). The defendant must first establish that a seizure occurred and, second, that the seizure was illegal. Graham, 214 Ill. App. 3d at 806. Pursuant to the fourth amendment, a seizure occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980). Factors to consider include: (1) the time and place of confrontation; (2) the number of officers; (3) the presence or absence of family or friends; (4) the presence of conduct normally involved in a formal arrest procedure, such as physical restraint, the show of weapons or force, booking or fingerprinting; and (5) the manner by which the individual is transported to the police station. Graham, 214 Ill. App. 3d at 807.

Here, we find that the evidence presented at the hearing on the motion to quash arrest supports the trial court's finding that defendant voluntarily accompanied the detectives to the police station. Detectives Bautista and Keane confronted defendant in his home and told him that they were investigating a homicide and wanted to ask him some questions at the police station, to which defendant agreed. The detectives testified that they were the only two officers at defendant's home, and they specifically

9

denied the presence of a third officer. Defendant's mother and sister were at home with defendant when the detectives arrived. Detective Bautista conversed with defendant's mother in Spanish, telling her where the police station was located and giving her a card with his telephone number. Defendant was neither physically restrained by the detectives nor was he handcuffed. The testimony at the hearing indicated that defendant walked out of his home with the detectives. Defendant was transported to the police station in an unmarked car and was not fingerprinted or read his Miranda rights. Defendant was brought to an interview room where the door was closed but not locked. Although some of defendant's testimony conflicted with the detectives' testimony, the trial court believed the detectives' testimony rather than that of defendant. We find no evidence to the contrary. The trial court's findings are supported by the record and are not against the manifest weight of the evidence. The trial court did not err in denying defendant's motion to quash his arrest and suppress evidence.

Defendant relies on People v. Vega, 203 Ill. App. 3d 33 (1990). In Vega, this court found that the defendant had been seized without probable cause. This court noted that: the defendant was not questioned briefly in his home where he was found, despite his mother's inquiry as to why he could not be questioned at home; the defendant was searched before being placed into the back of a locked squad car and transported to the police station; the defendant was placed in an interrogation room at the police station and was only let out to speak with his mother on the telephone because officers had encouraged her to convince the defendant to take a polygraph

test; and police officers transported the defendant in a police car to a crime laboratory for a polygraph examination without his consent. Vega, 203 Ill. App. 3d at 42-43. This court found that, considering all of the above circumstances, a reasonable person in the defendant's situation would not have considered himself free to go. Vega, 203 Ill. App. 3d at 43.

Here, unlike in Vega, the detectives told defendant that they wanted to bring him to the police station to ask him questions about a homicide. Neither defendant's mother nor his sister asked the detectives whether defendant could be questioned at home. Also, defendant was not searched prior to being transported to the police station. Further, there was no testimony that officers attempted to pressure or coerce defendant to submit to a polygraph examination as in Vega. We are not persuaded by defendant's reliance on Vega. Accordingly, we find the trial court's denial of defendant's motion to quash his arrest and suppress evidence was proper.

Next, defendant contends that his written statement should be suppressed because it violates the "question first-warn later" interrogation technique found unconstitutional in Missouri v. Seibert, 542 U.S. 600, 159 L. Ed. 2d 643, 124 S. Ct. 2601 (2004). In Seibert, a plurality of the United States Supreme Court held that Miranda warnings given mid-interrogation, after the defendant had given a confession, were ineffective, and the confession, which the defendant repeated after Miranda warnings were given, was inadmissible at trial. In Seibert, the interrogating officer admitted that he intentionally employed an interrogation technique he had been taught in which he

questioned the defendant without providing Miranda warnings first and obtained a confession and then provided Miranda warnings and repeated the questions to obtain the same answers "legally."  The Supreme Court found that the threshold inquiry to determine whether a confession was voluntary was whether it would be reasonable to find that, under these circumstances, the warnings could function effectively as Miranda required.  Seibert, 542 U.S. at 611-12, 159 L. Ed. 2d at 655, 124 S. Ct. at 2610.  The plurality determined that it was likely that postconfession Miranda warnings would be ineffective in preparing a suspect for successive interrogation close in time and similar in content because a suspect who had just admitted guilt would hardly think he had a genuine right to remain silent.  Seibert, 542 U.S. at 613, 159 L. Ed. 2d at 655-56, 124 S. Ct. at 2610-11.

Prior to Seibert, the Supreme Court's analysis in Oregon v. Elstad, 470 U.S. 298, 84 L.Ed. 2d 222, 105 S. Ct. 1285 (1985), governed interrogations in which the defendant had first made inculpatory statements without the benefit of Miranda warnings, and then repeated those statements after Miranda warnings were given.  In Elstad, the police went to the defendant's home to arrest him on a charge of burglary.  As one of the officers spoke with the defendant's mother to explain why the defendant was being taken into custody, another officer detained the defendant in another room, informing him that the officers believed he was involved in a burglary.  The defendant then acknowledged that he had been at the scene.  After being taken to the police station, the defendant received full Miranda warnings, waived his rights and gave a

12

confession.  The Supreme Court held that the failure to give the defendant his <u>Miranda</u> warnings before his initial inculpatory statement did not require suppression of his subsequent warned confession.  The Supreme Court stated:

"It is an unwarranted extension of <u>Miranda</u> to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.  Though <u>Miranda</u> requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."  <u>Elstad</u>, 470 U.S. at 309, 84 L.Ed. 2d at 232, 105 S. Ct. at 1293.

We find the Seventh Circuit's guidance in its recent opinion in <u>United States v. Stewart</u>, 388 F.3d 1079 (7th Cir. 2004), helpful.  The opinion analyzes the interplay between <u>Seibert</u> and <u>Elstad</u>.  In <u>Stewart</u>, the Seventh Circuit determined:

"At least as to *deliberate* two-step interrogations in which <u>Miranda</u> warnings are intentionally withheld until after the suspect confesses, the central voluntariness inquiry of <u>Elstad</u> has been replaced by a presumptive rule of exclusion, subject to a multifactor test for change in time, place, and circumstances from the first statement to the second. * * *  Where the initial violation of <u>Miranda</u> was not part of a deliberate strategy to

13

undermine the warnings, Elstad appears to have survived Seibert."

Stewart, 388 F.3d at 1090.

Here, we examine whether there was any evidence that the detectives intentionally employed the two-step interrogation technique of question first, warn later when defendant was interviewed at the police station. We find no evidence in the record to support such a finding. Detective Bautista testified that defendant was a witness and not a suspect when he was brought to the police station. He stated that it was only later in the afternoon, sometime after Jose Leal implicated defendant in the murder, that defendant would not have been free to leave. There is no indication that the detectives intentionally withheld Miranda warnings in order to first secure a confession, only to have defendant repeat it after being given Miranda warnings.

Defendant specifically argues that his written confession violates the holding in Seibert and should be suppressed because "the interrogation from the incriminating oral statement to the incriminating oral and written statements [is] one continued interrogation." As stated above, courts should depart from the Elstad analysis of voluntariness only where the police set out deliberately to withhold Miranda warnings until after a confession has been secured. There is no evidence that this occurred. We reject defendant's contention that his written statement should be suppressed because it violates the "question first-warn later" interrogation technique found unconstitutional in Seibert.

Accordingly, we affirm the judgment of the circuit court.

14

Affirmed.

THEIS, P.J., and GREIMAN, J., concur.