THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROB-
ERT HERNANDEZ, Defendant-Appellant.

First District (3rd Division)   No. 1—93—1930

Opinion filed March 20, 1996.

546

Jeremiah W. Lynch, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Susan R. Schierl, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TULLY delivered the opinion of the court:

Following a bench trial, defendant, Robert Hernandez, was found guilty of first-degree murder in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—1 (now 720 ILCS 5/9—1 (West 1994))) and sentenced to 40 years' imprisonment. It is from the judgment of conviction that defendant now appeals to this court pursuant to section 6 of article VI of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Supreme Court Rule 603 (134 Ill. 2d R. 603).

For the reasons which follow, we affirm.

## FACTUAL BACKGROUND

The following pertinent facts were adduced at trial. On August 4, 1991, at about 4 a.m., Ismael Robles, Lisa Kemic, John Thomas, Connie Velez, Bernadine Strunk and Jose Hernandez were sitting outside an apartment building at 2348 South Washtenaw Avenue in Chicago talking and drinking beer. Two men approached the group from around the corner, followed shortly thereafter by a third. An argument ensued, and one of the men shot and killed Ismael Robles. An autopsy revealed that the cause of death was a gunshot wound to the chest. On September 5, 1991, three Chicago police officers searched defendant's automobile and uncovered a .25-caliber automatic pistol in a secret compartment in the door of the car. Chicago police evidence technicians and a firearms examiner determined that the bullet retrieved from Robles' body had been fired from the recovered handgun.

## THE SUPPRESSION HEARINGS

Before trial, the trial court held a hearing on defendant's motion to suppress physical evidence obtained from his automobile on the ground that defendant did not willingly consent to the warrantless search.

Defendant testified that on September 5, 1991, at about 6 p.m., he was in the bedroom of his apartment, and his wife was in the backyard barbecuing. Three police officers arrived at the back door of his home, entered and began searching the apartment. Defendant recounted that the police did not present a warrant and did not seek his permission to enter or search the apartment. Subsequently, the police took defendant to their patrol car parked in an alley behind defendant's apartment and told him that he had to go to the police station. According to defendant, the police drove him approximately half a block down the alley; then, they stopped the car and told him to sign a "consent to search" form. Defendant testified that he

resisted, but the police told him that he had to sign the form. Defendant further testified that he quickly read the form but did not read it thoroughly or understand it. Defendant stated that the police kept staring at him and told him that he had to sign it because they had a report that he was selling drugs from his garage. Defendant claimed that the police told him that they were only going to search the trunk of his car. Defendant then signed the form, and the officers then drove back to defendant's garage and began to search both the trunk and the passenger compartment of the vehicle. The police then told defendant that they were taking both him and his automobile to the police station. Defendant further stated that he never gave the police permission to take his automobile off the premises.

Christina Guteirrez, the occupant of the apartment beneath defendant's, and Olga Lopez, defendant's "common law wife," also testified for the defense. Guteirrez testified that she had been a friend of defendant for about eight years. Both Guteirrez and Lopez stated that they were in the backyard barbecuing when the police arrived at the apartment. Both witnesses testified that they observed the officers escorting defendant from the apartment to the squad car in the alley. Moreover, both witnesses attested that the police and defendant never stopped while on their way to the alley, and neither witness saw the officers or defendant with any papers or writing instruments. Both witnesses stated that they did not actually observe the police car leave the alley; nevertheless, they knew that the car had left. The officers returned with defendant approximately five minutes later. Guteirrez and Lopez then saw defendant open the garage door. Both witnesses also saw police take defendant's car and leave with him in their car.

Detectives James Hanrahan, Jack Boock and Mike Miller, the three officers that allegedly searched defendant's apartment and automobile, testified for the State. Hanrahan testified that when the officers arrived at defendant's apartment, they informed defendant that he was under arrest for murder. Hanrahan then gave defendant *Miranda* warnings, and defendant stated that he understood. According to Hanrahan, the police escorted defendant into the yard and informed him that they wanted to search his car for evidence related to the murder. The officers asked defendant to sign a "consent to search" form, to which he agreed. Hanrahan explained to defendant that he had the right to deny access to his automobile; however, Hanrahan testified that defendant said it was all right. Hanrahan stated that he instructed defendant to read the first paragraph of the form with him to ensure that defendant understood. Then, Hanrahan allowed defendant to continue reading to himself. Hanrahan denied

that the police ever told defendant that they would only search the trunk of his car. After the consent form was signed, defendant opened the garage door. Because the garage was too cluttered to permit an effective search, Hanrahan asked defendant if the vehicle could be moved to police headquarters. According to Hanrahan, defendant consented and gave him the keys to the vehicle. Hanrahan denied ever taking defendant down the alley in the squad car or repeatedly telling defendant to sign the consent form. Furthermore, during his testimony, Hanrahan indicated that the police had received information from Frank Alvarado that defendant had a secret compartment in his car where he would conceal weapons and narcotics.

Boock and Miller also testified at the hearing and corroborated Hanrahan's account of the events. Moreover, Boock and Miller stated that the officers did not search defendant's apartment and that they never told defendant that he was suspected of selling drugs from his garage.

The trial court found that defendant was not in any way forced or threatened to sign the consent form but, rather, voluntarily gave his consent. Moreover, the court determined that defendant voluntarily removed the automobile from the garage. Thus, the trial court denied the motion to suppress evidence.

The trial court also held a hearing on defendant's motion to suppress statements made by defendant to the police on the grounds that defendant was not properly advised of his rights. The trial court heard the arguments and denied the motion to suppress statements.

## THE TRIAL

Lisa Kemic and Connie Velez testified at trial that they and a group of friends, including Robles, the victim, were gathered in front of an apartment building on August 4, 1991, at about 4 a.m. Kemic stated that she saw a car drive by very slowly, and shortly thereafter two men came from around the corner and approached the group. One of the men that approached was carrying a bottle in his hand and insisted that the group "represent" or identify with which street gang they were affiliated; the other man remained quiet. Velez, Strunk and Hernandez identified the quiet man as "J.J." or James Bonanno. According to Velez, Robles indicated that he was a family man and not a part of any gang. Velez testified that the two men represented that they were affiliated with the "Kent Nation" street gang. Kemic and Velez stated that the two men then began to retreat back to the corner, and Velez followed them. Velez told the court that she pushed the man with the bottle and told him to keep on walking. Next, Kemic and Velez testified that someone approached

on a bicycle and represented that he was affiliated with the "Disciples," a rival gang. Almost simultaneously, a third man appeared from around the corner, and Kemic identified him as defendant. Velez then attested that the man with the bottle threw the bottle into the intersection and yelled to someone, "[G]et the gun." Velez subsequently observed one of the men proceed to an automobile parked on 24th Street and retrieve a gun. The man then returned and fired the gun at the group. Kemic identified defendant as the man with the gun. Velez pushed the gunman's hand into the air, and he elbowed Velez and pushed her against the wall. Kemic and Velez heard several more shots. After the third shot, Kemic heard Robles say, "I'm hit," and noticed him trying to retreat to the tavern across the street. Velez then watched the gunman and his companions get into a grey Buick bearing an Illinois license plate with the number UB 139. The parties stipulated that this vehicle belonged to defendant.

At trial, Frank Alvarado testified that he and defendant had gone to a carnival together earlier in the evening and then went to a bar called the "Prime Tender." Alvarado and defendant met Bonanno at the lounge and, after a period of time, left the lounge in defendant's automobile. According to Alvarado, the three were heading toward his residence at 2700 South Whipple Drive when they arrived at the intersection of 24th Street and Washtenaw Avenue at about 4 a.m. Alvarado recollected that they stopped at the intersection and that he and Bonanno exited the car, later followed by defendant. Alvarado attested that he was intoxicated at the time and that he was carrying a bottle in his hands. Alvarado recalled an argument that took place between himself, Bonanno and the group seated outside of the apartment building. As the group began to approach Alvarado and Bonanno, a man came by on a bicycle and began yelling gang slogans. It was at that time that Alvarado threw the bottle at the group and ran toward his house. Alvarado stated that Bonanno also ran, but defendant came afterwards. Further, Alvarado testified that he heard no gunshots after he ran from the scene.

However, portions of Alvarado's trial testimony contradict his earlier grand jury testimony. In front of the grand jury, Alvarado stated that on the morning in question, defendant stopped the car so that Alvarado could talk to a friend, Frannie, whom he saw near the building where the Robles' group was gathered. As Alvarado was speaking to Frannie, Robles, whom Alvarado knew as "Rusty," approached him, speaking profanity and telling him to leave. Alvarado testified that he became nervous and, therefore, threw the bottle at Robles. Defendant then followed Robles into the street and began

shooting. Alvarado told the grand jury that he heard approximately seven to nine shots. The parties stipulated that Alvarado was never exhibited in any police lineup.

At the conclusion of the trial, defendant was found guilty of first-degree murder and sentenced to 40 years' imprisonment.

## ISSUES PRESENTED FOR REVIEW

On appeal, defendant contends that: (1) the trial court erred in denying his motion to suppress evidence; (2) he was not proven guilty beyond a reasonable doubt; and (3) the trial court abused its discretion in sentencing.

## OPINION

We first turn to defendant's contention that the trial court erred in denying his motion to suppress evidence. Defendant argues that he did not voluntarily consent to the search of his garage and the search and seizure of his car and, thus, the evidence obtained therefrom is tainted and should be inadmissible. We disagree.

■ In *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973), the United States Supreme Court addressed the issue of voluntariness as it applies to consent searches. The Supreme Court stated that whether a consent to search is voluntary and not the product of duress or coercion is a question of fact to be determined from the totality of the circumstances. *Schneckloth*, 412 U.S. at 227, 36 L. Ed. 2d at 862-63, 93 S. Ct. at 2047-48; see also *People v. Devine*, 98 Ill. App. 3d 914, 920, 424 N.E.2d 823 (1981). The State bears the burden of showing by a preponderance of the evidence that a consent to search was voluntarily given. *People v. Casazza*, 144 Ill. 2d 414, 417, 581 N.E.2d 651 (1991). The trial court's determination of the voluntariness of a consent will not be disturbed on review unless it is clearly unreasonable. *Schneckloth*, 412 U.S. at 227, 36 L. Ed. 2d at 862-63, 93 S. Ct. at 2047-48; see also *Devine*, 98 Ill. App. 3d at 920. " 'Because a court of review is not in a position to observe the witness as he testifies, questions of credibility and the weight to be given his testimony must be left largely in the discretion of the trial court.' " *People v. DeMorrow*, 59 Ill. 2d 352, 358, 320 N.E.2d 1 (1974), quoting *People v. Peterson*, 17 Ill. 2d 513, 514-15, 162 N.E.2d 380 (1959).

■ In the case *sub judice*, defendant argues that he did not voluntarily consent to the search of his vehicle but rather was coerced by police, given the circumstances of his arrest. The evidence presented by the parties as to this issue is in clear conflict. The defense witnesses are in accord that defendant was abruptly arrested and seized from his home before being asked to sign the consent form. Defen-

dant also claims that the police indicated that their desire to search was predicated on information received that he was selling drugs from his garage. Moreover, according to the defense, the police told defendant that he had to sign the consent form, allowed him insufficient time to read it and intimidated him by staring until he finally signed. The State contends, however, that defendant signed the consent form in his backyard, in the presence of his wife and friends, and that the police never drove him down the alley to obtain his signature. Furthermore, the State asserts that the officers informed defendant of his rights, allowed him ample time to read the consent form and witnessed defendant voluntarily sign the form. The State however, denies that the officers intimidated defendant or misrepresented the true purpose of the search.

After hearing the evidence presented at the suppression hearing, the trial court found the prominent issue here to be one of credibility. Therefore, the trial court carefully considered the integrity, demeanor and potential biases of the witnesses before making its ruling. The trial court discovered several difficulties with the credibility of the defendant and the defense witnesses as well as the many inconsistencies in their testimonies. As a result, the trial court determined that the State's evidence was more believable. Assessing the credibility of witnesses and determining the weight of the evidence are strictly within the competence of the finder of fact. *People v. Ellis*, 74 Ill. 2d 489, 496, 384 N.E.2d 331 (1978). Where evidence presented on an issue is in conflict, a court of review will accept the findings of the trial court unless they are clearly unreasonable. *De-Morrow*, 59 Ill. 2d at 358.

Our review of the record indicates that the trial court was not unreasonable in finding the defense witnesses less believable than those of the State based upon their demeanor when testifying and possible bias in not wanting defendant to be convicted. Moreover, under the totality of circumstances here presented, we agree with the trial court that the defendant's consent was voluntary and free from coercion. Because a voluntary consent to a warrantless search and seizure waives the constitutional privilege, the evidence derived therefrom is thus admissible at trial. *Devine*, 98 Ill. App. 3d at 922, citing *People v. Ledferd*, 38 Ill. 2d 607, 232 N.E.2d 684 (1967). Therefore, the trial judge did not err in declining to suppress the evidence obtained from the search of defendant's car.

■ We next turn to defendant's second contention that the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt. Specifically, defendant argues that the identifications made by the State's witnesses were unreliable and that their testimonies were inconsistent and perjurious.

In criminal cases where the sufficiency of the evidence is at issue, a court of review must determine whether the evidence, when viewed in the light most favorable to the prosecution, is such that any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985). Moreover, "[a] criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt as to defendant's guilt." *People v. Burrows*, 148 Ill. 2d 196, 224, 592 N.E.2d 997 (1992).

After viewing the evidence in the light most favorable to the prosecution, we find that a rational fact finder could have found defendant guilty beyond a reasonable doubt. Defendant argues that Kemic's testimony. is contradictory and that her feeble identification of him is unreliable given her lack of opportunity to observe the crime. Defendant claims that Kemic stood in a recessed doorway and, thus, was unable to observe the shooting. However, according to Kemic, she was not standing in the doorway but, rather, in front of it, watching what was happening. Defendant also argues that Kemic was unable to positively identify him as the shooter. "The fact that a witness does not positively identify a defendant at trial, however, does not render [the witness'] testimony invalid [citation]; it simply affects the weight the trier of fact will give the evidence [citation]." *People v. Herrett*, 137 Ill. 2d 195, 204, 561 N.E.2d 1 (1990). Here, Kemic's testimony indicates that she did have a sufficient opportunity to observe the shooting and that she was attentive to the events in question. Kemic was also reasonably certain when identifying defendant in a lineup. Moreover, Kemic's identification was corroborated by evidence establishing that the automobile in which the three men were seen arriving at the crime scene was registered to defendant and that the murder weapon was subsequently recovered from that automobile. The trial court specifically found Kemic a credible witness and determined that she did, in fact, have an opportunity to observe. This court will not second-guess the judgment of the trial court as to issues of credibility. It has been well established that the trier of fact is in the best position to make such determinations. *Collins*, 106 Ill. 2d at 261. Thus, it is conceivable that, based on the evidence presented, the trial court would elect to place great weight on Kemic's identification of defendant.

Defendant also urges that Alvarado's testimony should be discounted because the witness perjured himself at trial by testifying inconsistently with his prior grand jury testimony. In front of the grand jury, Alvarado testified that he saw defendant shoot at Robles

and heard seven to nine shots. However, at trial, Alvarado stated that, after throwing the bottle, he ran and never saw defendant with a gun or heard any gunshots. The State subsequently impeached Alvarado with his prior grand jury testimony. Defendant claims that the State relied on Alvarado's testimony, knowing that it constituted perjury, in order to obtain a conviction. Moreover, defendant claims that, without this evidence, he could not have been proven guilty beyond a reasonable doubt.

Although defendant is correct in noting inconsistencies between Alvarado's testimony and his prior grand jury statements, these are simply minor conflicts with prior testimony. Mere inconsistencies in testimony taken at different times affect the weight and credibility of the evidence but fall short of establishing a knowing use of perjury. *People v. Foster*, 190 Ill. App. 3d 1018, 1030, 547 N.E.2d 478 (1989); see also *People v. Henderson*, 36 Ill. App. 3d 355, 384, 344 N.E.2d 239 (1976). After reviewing the alleged inconsistencies, we conclude that they are too insignificant to rise to the level of perjured testimony. Instead, we hold that the prior testimony was properly admitted as substantive evidence.

The case at hand is analogous to *People v. Atkins*, 161 Ill. App. 3d 600, 515 N.E.2d 272 (1987). In that case, one of the State's witnesses testified at a grand jury proceeding that the defendants both planned to murder the victim and distributed guns to fellow gang members in preparation. However, at trial, the witness merely placed defendants together at an apartment and denied having seen the guns. Because the State was permitted to impeach the witness with his prior grand jury testimony and because the court determined that his grand jury testimony was voluntary, the court allowed the witness' prior grand jury testimony to be used as substantive evidence. *Atkins*, 161 Ill. App. 3d at 612, citing Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1 (now 725 ILCS 5/115—10.1 (West 1994)).

Similarly, in the present case, Alvarado's prior grand jury testimony was inconsistent with his trial testimony. In addition, there has been no allegation that Alvarado's grand jury testimony was involuntary. Furthermore, since the State used his prior grand jury testimony to impeach him at trial, the testimony could properly be considered by the court as substantive evidence pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—10.1 (West 1992)). Thus, given the strong corroboration of all of the evidence in this case, we believe that a rational trier of fact could have found defendant guilty of murder beyond a reasonable doubt. Consequently, we find no error as to this point.

■ Still to be considered is defendant's final contention that the

trial court abused its discretion in sentencing him. Defendant argues that his 40-year sentence was excessive given his lack of criminal history, age and possible provocation. We disagree.

Pursuant to the 1970 Illinois Constitution, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A trial court's sentencing decisions are entitled to great deference and weight. *People v. Ward*, 113 Ill. 2d 516, 526, 499 N.E.2d 422 (1986); *People v. Streit*, 142 Ill. 2d 13, 18, 566 N.E.2d 1351 (1991). Absent an abuse of discretion by a trial court, a sentencing decision shall not be altered upon review. *People v. Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882 (1977). An abuse of discretion can be found in a sentence that is within the statutory limitations if such sentence varies greatly with the purpose and spirit of the law. *People v. Steffens*, 131 Ill. App. 3d 141, 475 N.E.2d 606 (1985); see also *People v. Gibbs*, 49 Ill. App. 3d 644, 364 N.E.2d 491 (1977). Moreover, a trial judge is in the best position to determine the appropriate sentence, for such judge can consider firsthand "[a] defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age [citation]." *Streit*, 142 Ill. 2d at 19.

Contrary to defendant's assertions, the record reveals that the trial judge carefully balanced all mitigating and aggravating factors involved before imposing its sentence. Pursuant to section 5—8—1 of the Unified Code of Corrections, the statutory sentencing range for first-degree murder is 20 to 60 years' imprisonment. 730 ILCS 5/5—8—1 (West 1994). The trial court specifically considered defendant's lack of criminal background as a factor in mitigation. Moreover, the trial court noted the fact that defendant had attended high school and trade school and had a family. Clearly, it was these mitigating factors that caused the court to impose a sentence 20 years less than the statutory maximum. However, the trial court also considered the factors in aggravation, namely, that defendant's actions caused the death of another and that defendant's prior conviction was for unlawful use of a weapon. In addition, the trial court stated, and we agree, that defendant was a 28-year-old father who should have been home sleeping with his family at 4 a.m. and not involved in gang-related violence.

■ Finally, defendant claims that the trial court should have taken into account the fact that there may have been provocation by Robles and his friends. Although the record indicates that there may have been an argument between the two groups, this evidence was never fully developed by the defense. Moreover, defendant's whereabouts during the initial encounter between the two groups was also

never clearly established. Defendant cannot claim to have been provoked by an argument that took place outside of his presence. In fact, upon careful review of the record, we cannot find any words or acts that could have provoked defendant to retrieve a gun and shoot a man. Accordingly, we find no abuse of discretion by the trial court.

In light of the foregoing, we affirm the judgment of the circuit court of Cook County.

Affirmed.

RIZZI, P.J., and CERDA, J., concur.