THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. FRANCISCA CALDERON et al., Defendants-Appellees.

First District (6th Division)    No. 1—01—3395

Opinion filed December 20, 2002.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Todd M. Fine, Assistant State's Attorneys, of counsel), for the People.

Peter Vilkelis, of Chicago, for appellee Francisca Calderon.

Gregory Paul Vasquez, of Chicago, for appellee Jose Jimenez.

John R. DeLeon, of Chicago, for appellee Sergio Perez.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Defendants Francisca Calderon, Jose Jimenez, and Sergio Perez were charged with one count of possession of cannabis with intent to deliver and two counts of possession of a controlled substance with intent to deliver after drugs were found in a residence which they were observed entering and exiting. Each defendant filed a motion to quash arrest and suppress evidence, which the trial court granted. In support of its order granting those motions, the trial court found that although the police had sufficient information to initially detain defendants and conduct an investigative stop, their continued detention of defendants constituted an arrest without probable cause. In addition, the trial court found that consent to search forms signed by Jimenez and Calderon were invalid and, therefore, did not authorize the police to enter and search the residence in question. The State appeals, contending that the drugs recovered during the search of the residence should not have been suppressed because defendants' detention constituted a lawful investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), and Jimenez and Calderon gave valid consent to search the residence where the drugs were recovered.

## BACKGROUND

At the hearing on the motion to suppress, Perez testified he lived with Calderon, his girlfriend, at 6234 South Francisco Avenue in Chicago. On August 26, 2000, Perez drove Jimenez and Calderon to the Francisco Avenue residence in his car, a 1991 Cadillac. They arrived around noon, parked in the rear carport, and went inside the house. A few minutes later they came back outside, got into the car, and drove away.

Approximately two blocks from the house, an unmarked police car pulled over Perez's car. Three police officers ran up to Perez's car with their guns drawn and yelled at defendants, ordering them to get out of the car and spread their hands on its trunk. The officers searched defendants but did not find any drugs or guns on them. The officers

then handcuffed defendants, placed them in the backseat of an unmarked police car, and searched Perez's car for approximately 10 minutes. The officers did not find any drugs or guns in the car.

Perez stated that approximately 20 minutes after searching the car, the officers drove defendants back to the Francisco Avenue residence. The officers took Perez and Calderon out of the police car and separately questioned Calderon. After questioning Calderon, the officers opened the back door of the Francisco Avenue residence with a key removed from Perez's belt by one of the officers. Perez testified that the officers took defendants into the dining room and had them sit handcuffed while they searched the house. The officers did not have a search warrant and, according to Perez, did not ask defendants for permission to enter or search the home before beginning their search. Perez estimated that 10 to 12 officers were in the house at the time of the search. A few minutes after the search began, one of the officers came up from the basement and indicated drugs had been found.

Following the search, an officer approached Perez and asked him to sign a consent to search form. Perez refused despite the officer's insistence that signing it would be best for him. An officer then approached Jimenez, asked him in Spanish to sign the consent form, and repeatedly told him that if he signed the consent form, he would be allowed to go home. When Perez told Jimenez in Spanish not to sign anything, the officer yelled at Perez, telling him to shut up and mind his own business. Jimenez eventually signed the consent form. An officer then approached Calderon and asked her to sign the consent to search form. Perez stated that while asking her to sign the form, the officer was "scaring her[,] yelling at her[,] and trying to intimidate her." She, too, signed the consent form, and defendants were subsequently formally arrested and taken to the police station.

On cross-examination, Perez admitted he knew the drugs were in the basement of the house on Francisco Avenue and that he leased that house using a name which was not his own. In addition, Perez admitted that although he had purchased the Cadillac he was driving about a month prior to the stop by the police, he never changed the title to reflect he was the new owner.

Sergeant Joseph Salemme of the Chicago police department testified that he spoke with a confidential informant by telephone around 4 p.m. on August 25, 2000, the day before defendants were stopped by the police. The informant told him that a large amount of drug-related money was being stored in a second-floor apartment at 1633 South Austin Avenue in Cicero, that marijuana and cocaine were being stored in the basement of 6234 South Francisco Avenue in Chicago, and that

both these addresses were related to the same organization. The informant described a white male Hispanic in his forties, about 5 feet 8 inches tall, 180 pounds, with a scar under his left eye. In addition, he stated that the home on Francisco Avenue had two 25-year-old Hispanic occupants, one male and one female. The male was 5 feet 10 inches tall, 200 pounds, and significantly tattooed; the female had long, dark hair. Based upon this information, which was received at around 4 p.m. on August 25, 2000, and was less than 48 hours old, he ordered surveillance of both addresses. The Francisco Avenue residence was under surveillance approximately 20 hours before defendants were stopped on August 26, 2000. The record reflects no attempt was made to obtain a search warrant for the Francisco Avenue residence.

Shortly after talking with the informant, Sergeant Salemme went to the apartment at 1633 South Austin Avenue, Cicero, to participate in the surveillance. That evening Sergeant Salemme and Detective Maher attempted to gain access to the Cicero apartment by ringing the front doorbell. When no one answered, Detective Maher went to the back of the building. He observed a white Hispanic female with long, dark hair looking out the rear window of the second-floor apartment. He observed her run down into the basement laundry room with a gray and black shoe box, place the box under a blanket, and run back upstairs.

Sergeant Salemme and Detective Maher knocked on the door of the first-floor apartment at 1633 South Austin Avenue and spoke with Maria Hermosillo, who answered the door. They asked her if she would allow them to search the common area of the basement laundry room. After she agreed and signed a consent to search form, the two officers entered the laundry room and recovered the shoe box Detective Maher had previously observed. It contained approximately $129,480 in United States currency. The white Hispanic female observed by Detective Maher placing the shoe box in the basement was not defendant Calderon.

The following morning Sergeant Salemme informed Officer Jerry Masterson of the recovery made in Cicero and ordered him and his fellow officers to conduct an investigatory stop of anyone leaving the house on Francisco Avenue matching the descriptions given by the informant. At around 1 p.m. Officer Masterson phoned Sergeant Salemme and told him he had just stopped three people in a Cadillac who matched those descriptions. At no time during the detention of the defendants was an attempt made to obtain a search warrant for the Francisco Avenue residence.

In response to Officer Masterson's phone call, Sergeant Salemme

went to the house on Francisco Avenue. Sergeant Salemme stated that when he arrived there, at approximately 1:30 p.m., defendants had been held for at least 40 minutes. Sergeant Salemme told defendants "what [their] investigation had yielded so far" and, in the presence of another officer, separately spoke with each defendant in the alley next to the house and asked each of them for permission to search the Francisco Avenue residence. Sergeant Salemme acknowledged that none of defendants was given any *Miranda* warnings. Sergeant Salemme stated that Calderon and Perez were not handcuffed when he spoke with each of them, but he did not indicate whether Jimenez was handcuffed when he spoke with him. Perez told Sergeant Salemme he did not live at the residence and refused to sign a consent to search form. Calderon, on the other hand, told Sergeant Salemme she lived there and signed a consent to search form. Jimenez also signed a consent to search form.

After the consents were signed by Calderon and Jimenez, the officers entered the home using a set of keys that had been removed from Perez and subsequently found over 2,100 pounds of marijuana, approximately 29 pounds of methamphetamine, and 10.5 kilograms of cocaine in the basement.

On cross-examination, Sergeant Salemme admitted that defendants were not allowed to leave from the time they were first stopped two blocks from the Francisco Avenue residence. In addition, he acknowledged that he could not recall whether defendants were handcuffed when they were taken into the house on Francisco Avenue. Sergeant Salemme initially stated on cross-examination that he spoke, in order, with first Calderon, next Perez, and last Jimenez, and that Calderon and Jimenez signed consent forms after their respective conversations with him. Sergeant Salemme subsequently acknowledged, however, that the consent forms both listed 1:50 p.m. as the time they were signed. Regarding that inconsistency, he explained that, although he spoke with Calderon and Jimenez separately, he ultimately read the consent forms to both of them together and then had them sign the respective forms at the same time. Sergeant Salemme denied that any search was conducted before the consent forms were signed.

Sergeant Salemme approved and signed two case reports written in connection with the instant case, one for the Cicero surveillance leading to the recovery of money and the other for the Francisco Avenue surveillance leading to defendants' arrests and the recovery of drugs. The reports, which were begun one or two days after defendants were arrested, did not indicate that Sergeant Salemme called Officer Masterson and directed him to stop any Hispanic men or women leav-

ing the house on Francisco Avenue matching the descriptions provided by the informant. The report relating to the Cicero surveillance included the informant's description of the male Hispanic with a scar on his face, but did not include the descriptions of the other two people he mentioned to Sergeant Salemme. The report relating to the Francisco Avenue surveillance included the descriptions of all three people described by the informant. The reports did not indicate at what time the officers first entered the Francisco Avenue residence. Additionally, one of the reports stated defendants were stopped at 11:50 a.m., not 12:50 p.m., as Sergeant Salemme testified. Sergeant Salemme stated that the "11:50" notation was a typographical error and admitted he noticed this error while reviewing the reports in connection with defendants' motions but never corrected it or prepared a supplemental report.

Officer Jerry Masterson testified Sergeant Salemme called him at 9 a.m on August 26, 2000, and asked him and other members on his team to assist the team which had the 6234 South Francisco Avenue residence under surveillance. Sergeant Salemme told Officer Masterson he had recovered a large sum of money in Cicero in an investigation related to the surveillance of the Francisco Avenue residence and gave him descriptions of three suspects. One of the suspects was a male Hispanic who was approximately 40 years old, 5 feet 7 inches tall, and 180 pounds. The other two suspects were a 5-foot-10-inch-tall, 200-pound male Hispanic with multiple tattoos on his body and a female Hispanic with long dark hair. Both of them were approximately 25 years old.

Officer Masterson and the other officers on his team went to the Francisco Avenue residence and set up surveillance. Between 12:45 p.m. and 1 p.m., Officer Masterson saw a maroon Cadillac circle the block twice, turn into the alley on its third pass, and park in the carport at the Francisco Avenue residence. All three persons in the car, who were identified at the hearing as defendants, got out of the car and went inside the house. Approximately 10 to 15 minutes later defendants came out of the house and left in the car. Shortly thereafter, Officer Masterson and his fellow officers pulled over defendants' car a few blocks from the Francisco Avenue residence. The officers drew their guns, identified themselves as the police, and ordered defendants out of the car. Defendants were searched and handcuffed, but no weapons or contraband were found on them. The car was searched and no weapons or contraband were found. Officer Masterson explained that he got on the "zone radio" to ask for additional beat cars to be sent to the scene and noted that defendants were not allowed to get back into their car.

Officer Kathleen Schmidt testified she was one of the officers with Masterson who approached defendants after the car in which they were riding was pulled over. When Officer Schmidt asked defendants who owned the car, they responded that they did not know. When she asked what they were doing in the area, Calderon and Perez responded they had been walking around. Both denied being in the residence on Francisco Avenue. On cross-examination, Officer Schmidt acknowledged she did not read *Miranda* rights to either Calderon or Perez before she questioned them.

During the pat-down search of Perez, Officer Schmidt took keys that were hanging from Perez's belt. She indicated she took the keys in order to protect her safety and the safety of her fellow officers. Approximately 15 minutes after the stop, the officers transported defendants to 6234 South Francisco Avenue. While there, Schmidt walked down the gangway next to the house and smelled marijuana, and she noticed that the strongest odor came from the rear door leading to the basement. Schmidt was not present when the consent forms were signed. However, she eventually went into the house, and while searching in the basement, she found marijuana, cocaine, and methamphetamine.

The trial court granted defendants' motions to quash arrest and suppress evidence. The court found that although the police had sufficient information to initially conduct an investigative stop, their continued detention of defendants, based on the totality of the circumstances, transformed into an arrest without probable cause. In support of this finding, the judge noted:

"Was there based on the information that they had received from the confidential informant, the information that they had gained from their surveillance of the house in Chicago, the car going around the block 3 times, the individuals leaving the house after 15 minutes, was that enough for an investigative stop. Yes.

Did an investigative stop take place? We have to look at the totality of the facts. Once the car was stopped, guns were drawn at the time. The people were ordered out of the car, placed on the back of the car. Handcuffed, placed into a separate squad car and transported approximately 2 blocks away and they were detained for more than 30 minutes, 30 to 45 minutes till Sergeant Salemme came.

The State artfully and I mean this and I don't mean to— they were trying to deceive, compartmentalize[ ] all these individuals' [*sic*] events and had case law supporting that each and every one of those events was not probable cause. But like anything else, we have to look at the totality of the facts.

There is no doubt in my mind that that was an arrest. Was there probable cause for the arrest? No."

In further support of the order granting defendants' motions to quash arrest and suppress evidence, the trial judge found that the consent to search given by Calderon and Jimenez was not valid. The trial court first noted that none of defendants were given *Miranda* warnings. The trial court, however, focused primarily on its assessment of the credibility of the State's evidence. The trial court explained that credibility is not only based on truth and veracity, but also upon the ability of a witness to recall events and to communicate a recollection of those events during a hearing or trial. The trial court found that the State's evidence lacked credibility, explaining:

"Numerous things were not admitted. This was in a special unit of the Chicago Police Department. There were mistakes made in the police reports, they were never corrected. There [were] omissions made in the police reports. There [were] errors made as far as their consent to search document showed that the time completed on the consent to search forms was 1:50 p.m.

Sergeant Salemme says they were not done at the same time. The consent to search reports said they were. *** Sergeant Salemme said he couldn't recall if the 3 individuals were taken into the house with handcuffs on and these are abilities that pertain to the part of credibility about recollection and recordation. There [were] a lot of omissions in the police reports. Sergeant Salemme testified to [sic] that observations in his report appeared to be typographical errors, but they took no time concerning this case to ever file supplemental reports. So they cannot do that.

Someone has to tell them to go back to the basics. Certainly there was aggressive police conduct here. Which was outstanding. But it conflicts with the Constitution. Their errors and omissions concerning their police reports, the lack of ability to recall certain incidents that should be recalled. All reflects on the credibility.

So as far as consent to search forms, I find that due to lack of credibility, that they are not valid either. So the consent to search forms are invalidated. So the motions to quash arrest and suppress evidence are sustained."

## ANALYSIS

■ "When a motion to suppress evidence involves factual determinations or credibility assessments, we will reverse the trial court's ruling only if it is manifestly erroneous." *People v. Love*, 199 Ill. 2d 269, 274 (2002). When the parties do not dispute the facts or the credibility of witnesses, we apply *de novo* review to the trial court's ruling. *Love*, 199 Ill. 2d at 274. In the instant case, defendants and the State presented conflicting evidence regarding the circumstances surrounding defendants' detention and the consent to search given by Jimenez

and Calderon. The trial court specifically found that the State's evidence lacked credibility. Accordingly, because the credibility of the evidence presented is in dispute, we give great deference to the trial court's factual findings and review those findings under the manifestly erroneous standard. However, we apply *de novo* review to the ultimate question of whether the trial court properly granted defendants' motions to quash arrest and suppress evidence. *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996) (while findings as to relevant historical facts may be reviewed deferentially, the ultimate determination of probable cause should be reviewed *de novo* on appeal.)

■ Both the United States and the Illinois Constitutions govern the conduct of police officers in performing warrantless arrests and searches. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6; *People v. Mitchell*, 165 Ill. 2d 211, 219 (1995); *People v. Tisler*, 103 Ill. 2d 226, 245 (1984). The fourth amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV; accord Ill. Const. 1970, art. I, § 6. "A seizure, for fourth amendment purposes, is synonymous with an arrest, and an arrest effectuated without probable cause, or a warrant based thereon, violates the accused's constitutional rights." *People v. Centeno*, 333 Ill. App. 3d 604, 616 (2002). However, in *Terry*, the United States Supreme Court articulated an exception to the warrant and probable cause requirements. *Love*, 199 Ill. 2d at 275. Under *Terry*, a police officer may briefly stop and detain an individual to make reasonable inquiries if the officer has knowledge of articulable facts sufficient to create a reasonable suspicion that the individual in question has committed or is about to commit a crime. *Love*, 199 Ill. 2d at 275.

## DETENTION

The State contends that the police officers lawfully detained defendants pursuant to an investigative *Terry* stop. The State further argues the defendants were not arrested until after drugs were recovered as the result of the consent to search the Francisco Avenue residence given by Calderon and Jimenez.

Defendants do not dispute the fact that the officers initially had sufficient information to detain them pursuant to an investigative *Terry* stop. Rather, defendants contend that their continued detention exceeded the scope of a lawful investigative *Terry* stop and that the trial court properly found their detention eventually transformed into an arrest without probable cause.

■ To determine whether an arrest has occurred, "the court must

consider whether a reasonable person, innocent of any crime, would have believed that he was not free to leave." *People v. Williams*, 303 Ill. App. 3d 33, 40 (1999), citing *Michigan v. Chesternut*, 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975 (1988). "The factors to be considered in making this determination include: (1) the time, place, length, mood and mode of the interrogation; (2) the number of police officers present; (3) any indicia of formal arrest or restraint; (4) the intention of the officers; (5) the subjective belief of the defendant; (6) whether defendant was told he could refuse to accompany police; (7) whether he was transported to the station in a police car rather than arranging his own transportation; (8) whether he was placed in an interview room, as opposed to a common area; and (9) whether he was told he was free to leave." *Williams*, 303 Ill. App. 3d at 40. When determining whether an arrest has occurred, we are to consider the totality of the circumstances. *Williams*, 303 Ill. App. 3d at 40.

■ The State argues that "given the situation that the officers were confronted with, none of their actions, alone or in combination, converted the stop into an arrest." The State correctly notes that an investigative stop is not transformed into an arrest simply because an officer, during the course of the detention, draws his weapon (see *People v. Bujdud*, 177 Ill. App. 3d 396, 402 (1988)), or handcuffs a suspect (see *People v. Walters*, 256 Ill. App. 3d 231, 236-37 (1994)). In addition, the State correctly notes drawing a weapon and handcuffing an individual, in combination, do not necessarily establish that the individual has been arrested. See *People v. Starks*, 190 Ill. App. 3d 503, 508-09 (1989). The State also cites cases in which the reviewing court found that a stop does not become an arrest simply because an officer draws his gun and orders a suspect to lie facedown on the ground (see *People v. Paskins*, 154 Ill. App. 3d 417, 422 (1987)), or transports a suspect a few miles to determine whether robbery victims can identify him (see *People v. Lippert*, 89 Ill. 2d 171, 187 (1982)). We note, however, that when determining whether an investigative stop is transformed into an arrest, we must consider the factors identified in *Williams* not in isolation but together. The totality of the circumstances, including the length of detention and the scope of investigation, must be considered in determining whether detention of a suspect constitutes an arrest or a stop.

In the instant case, what began as a lawful investigative stop transformed into an unlawful arrest. An unmarked squad car pulled over defendants two blocks from the Francisco Avenue residence. Three officers got out of the squad car with their weapons drawn, approached defendants while yelling at them, and ordered them to get out of their car and spread their arms on the trunk. The officers

searched defendants and searched the car. No permission to search the car was requested by the officers. Although the officers did not recover any drugs or weapons during either search, they handcuffed defendants. Additional officers arrived on the scene in marked beat cars, and defendants were placed in the back of one of those cars and eventually driven back to the Francisco Avenue residence.

The State notes that in *Paskins* the reviewing court observed, " 'The [crucial] difference between an arrest and a stop lies not in the initial restraint on movement, but rather on the length of time the person may be detained and the scope of investigation which may follow the initial encounter.' " *Paskins*, 154 Ill. App. 3d at 422, quoting *People v. Roberts*, 96 Ill. App. 3d 930, 933-34 (1981). The State contends that an analysis of the length of time defendants were detained and the scope of the officers' investigation "leads to the inescapable conclusion that the seizure of defendants was pursuant to an investigative stop and not an arrest."

With respect to the duration of defendants' detention, the State contends that "the length of time that defendant[s] [were] detained was minimal, 30 minutes at most." Contrary to the State's contention and as noted above, the testimony of Sergeant Salemme, the State's own witness, indicates that defendants were detained not for 30 minutes but, rather, for approximately one hour before the police searched the Francisco Avenue residence. We recognize that a lawful investigative stop pursuant to *Terry* could conceivably extend beyond 30 minutes and that there is no fixed number of minutes beyond which such a stop automatically becomes an arrest. However, we reject the State's argument that the duration of defendants' detention in the instant case was reasonable or justified and constituted merely an investigative stop.

The State argues that "the scope of the investigation was short and limited" and asserts that the officers "simply asked some basic questions concerning the house on Francisco before transporting all three defendants back to the location to wait for Sergeant Salemme's arrival." The record contradicts this argument by the State and reflects the officers did more than merely ask defendants some basic questions before transporting them back to the house on Francisco Avenue. The officers ran up to the car with guns drawn, yelled at defendants, and ordered them to get out of the car and spread their hands on the trunk. The officers conducted not only a search of each defendant, but a search of the car. After searching each defendant, but finding no guns or drugs, the officers handcuffed defendants and placed them in the back of the unmarked police car. The officers then proceeded to search the car for 10 minutes, but found no drugs or

guns. Defendants were asked questions, but given no *Miranda* rights. Approximately 20 minutes after searching the car, the officers drove defendants handcuffed back to the Francisco Avenue residence and waited for Sergeant Salemme. Sergeant Salemme acknowledged that by the time he arrived at approximately 1:30 p.m. defendants had been held for at least 40 minutes. The consent to search forms were not signed until 1:50 p.m. By the time the consent to search forms were signed, defendants had been detained for approximately one hour. We reject the State's argument that the scope of the investigation was short, limited and constituted merely an investigative stop.

We note that although no drugs or weapons were found during the search of each defendant and the car, defendants were not allowed to leave but, rather, were transported to the Francisco Avenue residence in handcuffs. Defendants were not given any choice as to whether they could refuse to accompany the officers. In fact, Sergeant Salemme admitted that defendants were not allowed to leave from the time they were stopped, and Officer Masterson acknowledged that at no point were any of defendants allowed to return to their car. The State fails to explain why the officers were justified in transporting defendants to the Francisco Avenue residence and holding defendants there until Sergeant Salemme's arrival. After defendants were taken into the dining room of the Francisco Avenue residence, they were kept in handcuffs while 10 to 12 officers were present at the residence. The State does not identify any evidence which establishes that the officers' ability to effectively conduct their investigation required Sergeant Salemme to be present at the Francisco Avenue residence. Finally, we note that the State did not offer any evidence affirmatively contradicting Perez's testimony that defendants were kept in handcuffs inside the Francisco Avenue residence despite the large number of officers present there.

In the instant case, the officers stopped defendants with their guns drawn and ordered them out of their car. Defendants were searched, handcuffed, questioned and transported in a squad car to the Francisco Avenue residence where they were kept in handcuffs. These events took place over a period of approximately one hour before the consent to search forms were signed. The totality of these circumstances supports a subjective belief that defendants were under arrest and would have convinced any reasonable person that he or she was under arrest.

Sergeant Salemme admitted to problems regarding the reports that were prepared including omissions as well as mistakes. Both reports prepared failed to include the fact that Sergeant Salemme called Officer Masterson and ordered him to stop any Hispanic man or

woman leaving the Francisco Avenue residence matching the description given by the confidential informant. A report indicated Officer Masterson stopped defendants at 11:50 a.m., not at 12:50 p.m., as Sergeant Salemme testified. Sergeant Salemme testified that he noticed this error while reviewing the reports in connection with defendants' motions but did not correct it or prepare a corrected supplemental report. If the reported documentation of when defendants were first stopped was in fact accurate, defendants would have been detained almost two hours before the consent to search forms were signed.

■ Applying the factors identified in *Williams* to the instant case, we conclude that the trial court properly found that an arrest occurred without probable cause and before drugs were found at the Francisco Avenue residence. The trial judge's finding that a warrantless arrest occurred without probable cause is supported by the totality of the circumstances, including but not limited to the following factors taken together: (1) the time, place, length of the investigation; (2) the mood and mode of the interrogation; (3) the number of police officers present; (4) the indicia of restraint, including the use of handcuffs; (5) the intention of the officers, including the display of weapons; (6) the fact defendants were not told they could refuse to accompany the police; and (7) the fact defendants were not told they were free to leave.

Accordingly, based on the totality of the circumstances, we find the scope of defendants' detention went beyond that which was necessary, reasonable or justified. The findings of fact supporting the trial court's determination that the continued detention of defendants exceeded the scope of the initial investigative *Terry* stop and eventually transformed into a warrantless arrest without probable cause were not manifestly erroneous. For the reasons previously discussed, we reject the State's legal challenge to the trial court's ruling that defendants were arrested without probable cause.

## CONSENT TO SEARCH

■ The State next contends that the investigatory stop was not converted into an arrest until after valid consents to search were given and drugs were found in the basement of the Francisco Avenue residence. Having found that defendants were illegally arrested before consent to search was given, we address whether those consents were obtained through the exploitation of the unlawful arrest. In making this determination, we utilize the four factors set forth in *Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975). These factors are (1) the giving of *Miranda* warnings; (2) the temporal proxim-

ity of the arrest and consent; (3) the presence of any intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62.

■ The record reflects that defendants were not advised of their *Miranda* rights before giving the officers consent to search. There were also no intervening circumstances between the illegal arrest and the consent to search, which were close in time. Moreover, as noted in *Brown*, when police embark on an investigation in the hope that some incriminating evidence might be found the illegality has a quality of purposefulness. *Brown*, 422 U.S. at 605, 45 L. Ed. 2d at 428, 95 S. Ct. at 2262. In the instant case, the conduct of the police in stopping defendants with their guns drawn, searching defendants, searching the car, handcuffing defendants, removing them from the car, transporting them to the Francisco Avenue residence, and questioning them demonstrates the quality of purposefulness identified in *Brown* as a factor to be considered in determining whether consent was obtained by exploitation of an illegal arrest. *Brown*, 422 U.S. at 604, 45 L. Ed. 2d at 427, 95 S. Ct. at 2262. Based on the totality of the circumstances, we conclude defendants' consent to search was tainted by the illegal arrest and the contraband found in the Francisco Avenue residence was properly suppressed. *People v. Delaware*, 314 Ill. App. 3d 363, 374 (2000).

Moreover, even if the officers' detention of defendants did not constitute an illegal arrest in violation of their right to be free from unreasonable seizures, we find that the search of the Francisco Avenue residence violated defendants' fourth amendment right to be free from unreasonable searches and constitutes an independent basis for upholding the trial court's order granting defendants' motions to suppress evidence. The trial judge concluded the State's evidence regarding the issue of consent lacked credibility. We note, as an independent ground for suppression of the evidence, the trial judge found that the police did not have valid consent to search the residence.

The fourth amendment (U.S. Const., amend IV) bars warrantless and nonconsensual search and seizure in a person's home absent exigent circumstances. *Payton v. New York*, 445 U.S. 573, 590, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1382 (1980). "[W]hether a consent to search is voluntary and not the product of duress or coercion is a question of fact to be determined from the totality of circumstances." *People v. Hernandez*, 278 Ill. App. 3d 545, 551 (1996), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 36 L. Ed. 2d 854, 862-63, 93 S. Ct. 2041, 2047-48 (1973). Whether a defendant was given *Miranda* warnings prior to giving his consent to search is a factor relevant to

the determination of whether the consent was voluntary. *People v. Smith*, 124 Ill. App. 3d 914, 921 (1984). "The State bears the burden of showing by a preponderance of the evidence that a consent to search was voluntarily given." *Hernandez*, 278 Ill. App. 3d at 551. Reviewing courts are not in a position to observe witnesses as they testify; therefore, issues of credibility and the weight to be given their testimony must be left primarily to the trial court's discretion. *Hernandez*, 278 Ill. App. 3d at 551. This court will not disturb the trial court's determination of the voluntariness of a consent to search unless it is clearly unreasonable. *Hernandez*, 278 Ill. App. 3d at 551.

The State recognizes in its brief that whether a consent to search is voluntary is a question of fact to be determined from the totality of the circumstances. The trial court concluded that the State's evidence regarding the issue of consent lacked credibility. We note the State does not argue in its brief that the trial court improperly concluded that the evidence related to the issue of consent lacked credibility.

As a court of review, we are required to give great deference to the trial court's findings of fact and determinations regarding the credibility of the witnesses. *People v. Luna*, 322 Ill. App. 3d 855, 859-60 (2001). In the instant case, the record indicates that the officer questioning Calderon and seeking her consent to search yelled at her and tried to intimidate her. The record further reflects that the officer who asked Jimenez for his consent to search told Jimenez he could go home if he signed the consent to search form. The officers entered the home using a set of keys removed from Perez by Officer Schmidt allegedly because she had safety concerns. Perez testified the officers used these keys to enter the home before any consent to search forms were signed. Perez indicated that the officers did not ask for permission before they entered the house with the keys which were removed from his belt buckle after he was searched during the initial stop on the street. Perez testified that it was after the drugs were found in the Francisco Avenue residence that the officers asked him, then Jimenez, and lastly Calderon to sign the consent to search forms.

The trial court, after listening to the witnesses and observing their demeanor while testifying, determined that the State's evidence was inconsistent and not credible. Regarding the credibility of the officers, the experienced trial judge indicated as follows:

> "Someone has to tell them to go back to basics. Certainly there was aggressive police conduct here. Which was outstanding. But it conflicts with the Constitution. Their errors and omissions concerning their police reports, the lack of ability to recall certain incidents that should be recalled. All reflects on the credibility.
>
> So as far as consent to search forms, I find that due to lack of

credibility, that they are not valid either. So the consent to search forms are invalidated. So the motions to quash arrest and suppress evidence are sustained."

In support of this credibility finding, the trial court noted, among other things, Sergeant Salemme's inability to recall if defendants were wearing handcuffs when they were taken into the Francisco Avenue residence, his failure to file a corrected supplemental report regarding the Francisco Avenue investigation despite his knowledge that the original report contained errors and omissions, and the conflict between his testimony on cross-examination initially indicating that the consent to search forms were signed and completed at different times and the fact that both consent forms indicated 1:50 p.m. as the time they were signed. The trial judge also noted that no *Miranda* warnings were given by the police in connection with obtaining consent to search the residence.

Based on the evidence presented and the trial judge's credibility findings regarding that evidence, we cannot conclude the judge's determination that the consents were invalid was clearly unreasonable or against the manifest weight of the evidence. The totality of the circumstances supports the finding of the trial judge that the search of the residence was conducted without a warrant or valid consent and justifies suppression of the evidence. For the reasons previously discussed, we reject the State's legal challenge to the trial judge's ruling regarding the consent to search issue.

## CONCLUSION

We are mindful that the probable cause requirement of the fourth amendment and the Illinois Constitution regarding warrantless arrests and searches provides a balance between the individual's right to privacy and the need for effective law enforcement. *People v. Moody*, 94 Ill. 2d 1, 7 (1983). Decisions involving motions to quash arrest and suppress evidence, based on alleged violation of the fourth amendment and the Illinois Constitution, demand that we carefully balance the legitimate aims of law enforcement against the right of our citizens to be free from unreasonable governmental intrusion. *Tisler*, 103 Ill. 2d at 242-43; Ill. Const. 1970, art. I, § 6.

The ruling of the experienced trial judge that defendants were arrested without probable cause was supported by the totality of the circumstances. The ruling is consistent with the legal standards for determining when an investigatory stop transforms into an arrest. The trial judge carefully and seriously considered the credibility of the witnesses. The record, legally and factually, supports the trial judge's finding that the consents to search were not valid.

Based on the record, we conclude the trial judge's findings of fact were not manifestly erroneous. For the reasons previously discussed, we reject the State's legal challenge to the trial judge's ruling on defendants' motions to quash arrest and suppress evidence. We affirm the order of the trial court granting defendants' motions to quash arrest and suppress evidence.

Affirmed.

O'BRIEN, P.J., and GALLAGHER, J., concur.